HOSODA & MORIKONE, LLC

LYLE S. HOSODA         3964-0
KEVIN T. MORIKONE      8812-0
KRISTEN A. YAMAMOTO    9412-0
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii  96813
Telephone:  (808) 524-3700
Facsimile:   (808) 524-3838
Email: lsh@hosodalaw.com

Attorneys for Plaintiff
MARK N. BEGLEY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARK N. BEGLEY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF KAUAI, KAUAI POLICE DEPARTMENT; DARRYL PERRY; ROY ASHER; MICHAEL CONTRADES; AND DOE DEFENDANTS 16-100,<br><br>Defendants. | Civil No. CV16-00350 LEK-KJM<br><br>**SECOND AMENDED COMPLAINT; DEMAND FOR JURY TRIAL; EXHIBITS 1-4; [PROPOSED] SUMMONS** |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff MARK N. BEGLEY ("Plaintiff"), by and through his attorneys

Hosoda & Morikone, LLC, for complaint and causes of action against Defendants

County of Kauai ("County"), Kauai Police Department ("KPD"); Darryl Perry;

Roy Asher; and Michael Contrades, and hereby alleges and avers as follows:

## JURISDICTION AND VENUE

1.     The unlawful employment practices alleged below were committed by

the Defendants within the County of Kauai, State of Hawaii.  Plaintiff is a resident

of the County of Kauai, State of Hawaii.  The jurisdiction of this Court is invoked

pursuant to 28 U.S.C.A. §§ 1331, 1343(a)(4), 2201, 2202, and 42 U.S.C.A. §

2000e-5.

2.     Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b) and

42 U.S.C.A. § 2000e-5(g).

3.      Plaintiff requests a jury trial on all issues pursuant to 42 U.S.C.A. §

1981a.

## PARTIES

4.     Plaintiff is a 47-year old male citizen of the County of Kauai, State of

Hawaii, United States of America.  Plaintiff has been employed with KPD since

1996.[1]  He currently holds the position of Assistant Chief with the KPD.

5.     The County and KPD are at all times hereinafter government entities

engaged in industry affecting commerce, having one hundred or more employees

in each of twenty or more calendar weeks, and that the Defendant County's and

---

[1] Plaintiff was also employed with KPD from 1989 to 1994.

KPD's principal place of business are located in the County of Kauai, State of Hawaii, within this District.

6. At all times relevant to this action, Defendant Darryl Perry was the agent of and employed by the KPD as the Chief of Police ("Chief Perry"). As such, Chief Perry affected decisions to hire, fire, discipline, and/or promote Plaintiff and other employees of the KPD, and the KPD is responsible for Chief Perry's conduct in connection with the exercise of this authority, both apparent and real.

7. At all times relevant to this action, Defendant Assistant Chief Roy Asher was employed by the KPD as head of the Investigative Services Bureau within KPD ("Assistant Chief Asher"). Assistant Chief Asher reported to and was supervised by Chief Perry.

8. At all times relevant to this action, Defendant Michael Contrades was employed by the KPD as a Deputy Chief within KPD ("Deputy Chief Contrades"). Deputy Chief Contrades reported to and was supervised by Chief Perry.

9. At all times relevant to this action, Solette Perry ("Ms. Perry") was a resident of the County of Kauai, State of Hawaii and was/is married to Chief Perry.

10. At all times relevant to this action, Ernest Kanekoa, Jr. was the Chairman of the Kauai Police Commission ("Chairman Kanekoa") and a close friend of Chief Perry.

11.     At all times relevant to this action, Paul Applegate was employed by the KPD as a Lieutenant ("Lieutenant Applegate").  Lieutenant Applegate reported to and was supervised by his superiors at KPD.

12.     At all times relevant to this action, Elliott Ke was employed by the KPD as a Sergeant ("Sergeant Ke").  Sergeant Ke reported to and was supervised by his superiors at the KPD.

13.      At all times relevant to this action, Sherwin Perez was employed by the KPD as a Lieutenant ("Lieutenant Perez").  Lieutenant Perez reported to and was supervised by his superiors at the KPD.

14.     At all times relevant to this action, Alejandre Quibilan was employed by the KPD as an Assistant Chief ("Assistant Chief Quibilan").  Assistant Chief Quibilan reported to and was supervised by Chief Perry.

15.     At all times relevant to this action, Darla Abbatiello as employed by the KPD as a police officer ("Officer Abbatiello").  Officer Abbatiello reported to and was supervised by her superiors at the KPD.

16.     At all times relevant to this action, James Miller was employed by the KPD as a Sergeant ("Sergeant Miller").  Sergeant Miller reported to and was supervised by his superiors at the KPD.

17.     At all times relevant to this action, Randolph Chong Tim, Sr. was employed by the KPD as an Acting Assistant Chief ("Acting Assistant Chief

Chong Tim"). Acting Assistant Chief Chong Tim reported to and was supervised by Chief Perry.

18. At all times relevant to this action, Brandy Ledesma was employed by the KPD as a police officer ("Officer Ledesma"). Officer Ledesma reported to and was supervised by his superiors at the KPD.

19. At all times relevant to this action, Scott Williamson was employed by the KPD as a police officer ("Officer Williamson"). Officer Williamson reported to and was supervised by his superiors at the KPD.

20. At all times relevant to this action, Christian Jenkins was employed by the KPD as a police officer ("Officer Jenkins"). Officer Jenkins reported to and was supervised by his superiors at the KPD.

21. At all times relevant to this action, Thomas Takatsuki was employed by the County as the Acting Director of Personnel Services ("Acting Director Takatsuki").

22. At all times relevant to this action, Janine Rapozo was employed by the County as the Director of Human Resources ("Director Rapozo").

23. At all times relevant to this action, Jill Niitani ("Ms. Niitani") was employed by the County as a Human Resources Specialist.

24. Defendants DOES 16-100 are named herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff

except that they are connected in some manner with the named Defendants, their agents, principals, servants, representatives, co-venturers, associates, consultants, shareholders, officers, directors, aiders and abettors and/or were engaged in activities alleged in the Complaint filed herein; and/or were in some manner responsible for damages to Plaintiff; and/or who conducted some activity in a negligent and/or intentional manner, which negligent and/or intentional conduct was a proximate cause of the injuries or damages to Plaintiff; and/or who are in some manner related to the named Defendants. Plaintiff has made diligent efforts to ascertain the names and identities of these persons and/or entities by reviewing the documents involved, investigations with the Equal Employment Opportunity Commission of the United States of America ("EEOC"), as well as other investigations. Plaintiff prays leave to amend this Complaint to show the true names, capacities, activities and/or responsibilities when the same have been ascertained.

## ADMINISTRATIVE PREREQUISITES

25. The KPD is and was at all times hereinafter a government entity engaged in industry affecting commerce, having one hundred or more employees in each of twenty or more calendar weeks, and that the KPD's principal place of business is located in the County of Kauai, State of Hawaii, within this District.

26.     On or about November 14, 2012, Plaintiff filed a charge of discrimination with the EEOC under Title VII of the Civil Rights Act of 1964 ("Title VII"), § 704, 42 U.S.C.A. § 2000e-3(a), in which Plaintiff alleged he was retaliated against for opposing unlawful employment practices in violation of Title VII.  A copy of the EEOC complaint is attached hereto as **Exhibit 1**.

27.     On November 27, 2012, the Hawai'i Civil Rights Commission of the State of Hawai'i ("HCRC") informed Plaintiff that the EEOC would investigate Plaintiff's complaint under a work-sharing agreement with that agency.

28.     Subsequently, the EEOC commenced its investigation of the facts alleged in Plaintiff's complaint before it.

29.     On January 15, 2013, Plaintiff reported to the EEOC further acts of retaliation that the County, KPD, Chief Perry and others, had taken against him in further violation of Title VII.

30.     On March 13, 2013, Plaintiff reported continuing acts of retaliation taken against him to the EEOC.

31.     On June 27, 2013, Plaintiff filed an additional Charge of Discrimination with the EEOC.  A copy of the EEOC complaint is attached hereto as **Exhibit 2**.

32.     On April 25, 2014, the EEOC rendered its decisions that reasonable cause exists to believe that the KPD violated the statutes under Title VII of the

Civil Rights Acts of 1964, as amended. The decisions of the EEOC are attached hereto as **Exhibit 3**.

33.     Thereafter, the EEOC commenced conciliation efforts between Plaintiff and the KPD.

34.     Unfortunately, conciliation efforts between Plaintiff and the KPD failed to achieve voluntary compliance by the KPD under the law. Plaintiff requested that he be allowed to institute a civil action in the Federal District Court. A copy of the notice of right to sue letter within ninety days is attached hereto as **Exhibit 4**.[2]

35.     Shortly thereafter, Plaintiff's counsel submitted a request under the Freedom of Information Act ("FOIA") for all document relating to the EEOC's investigation of Plaintiff's EEOC retaliation complaints.

36.     On June 15, 2016, the EEOC responded to Plaintiff's FOIA request and provided its investigatory files to Plaintiff, which was comprised of approximately 842 documents.

37.     The EEOC's investigatory files revealed Chief Perry's interactions with KPD personnel, including Deputy Chief Contrades and AC Asher, and other County and State agencies to engage in and further retaliation against Plaintiff. The investigatory files included letters from Chief Perry to the State of Hawaii

---

[2] The HCRC also issued a Notice of Right to Sue letter, dated February 15, 2017, regarding Plaintiff's complaint.

Department of Labor and Industrial Relations ("DLIR") and the County Worker's Compensation adjuster relating to Plaintiff's worker's compensation stress leave and internal KPD emails, memorandums, summaries, transcripts and reports relating to KPD's investigations of Plaintiff while he was on worker's compensation stress leave. Prior to receiving the EEOC's investigatory files, Plaintiff was unaware of the aforementioned documents and County-wide retaliatory efforts made against him.

38.     Accordingly, Plaintiff has satisfied all administrative prerequisites for filing suit under Title VII and HRS §§ 368 and 378.

## STATEMENT OF FACTS

39.     From February 1989 until March 1994, Plaintiff was employed as a police officer with KPD. He left KPD in 1994 to accept a job offer with the State of Hawaii Department of Public Safety. In or around May 1996, Plaintiff returned to the KPD as a Police Services Officer. On or about January 24, 2011, Plaintiff began working as a Police Inspector[3] in KPD's Administrative and Technical Bureau.

40.     Shortly after his employment as a police inspector began at KPD, Plaintiff was informed that Assistant Chief Asher of the Investigative Services

---

[3] Technically, during the relevant time period the designations of "Police Inspector" and "Assistant Chief" were terms used to describe the same position and rank.

Bureau made an inappropriate gesture and comment to a subordinate female officer, Officer Abbatiello, several weeks before. The same female officer had previously requested a transfer to a higher paying position in the Vice Section at KPD. Assistant Chief Asher was unwilling to consider her for the position due to a prior complaint she made.

41.     Plaintiff promptly met with Chief Perry and reported the matter to him. During that meeting, Chief Perry stated that Assistant Chief Asher's behavior could get KPD sued for "big bucks". In addition, Chief Perry stated that he would take care of it, indicating to Plaintiff that no further action was needed or desired from Plaintiff.

42.     On or about February 4, 2011, Plaintiff received a work email from Chief Perry. In that email, Chief Perry made reference to the reported inappropriate behavior of Assistant Chief Asher. However, Chief Perry did not immediately authorize an investigation into the matter, and he did not initiate corrective action for the same.

43.     On or about August 5, 2011, in an effort of retaliation, Assistant Chief Asher circulated false, disparaging information about Plaintiff and his management orders. Assistant Chief Asher's false and disparaging statements created additional hostility for the female officer whom he previously discriminated against.

44.     Plaintiff learned of Assistant Chief Asher's lies soon after.  On or about August 25, 2011, Plaintiff sent an email to all KPD staff to inform them that Assistant Chief Asher's statements were untrue.

45.     Shortly after Plaintiff circulated the email, Chief Perry sent an email to the KPD staff, acknowledging that false information had been circulated about Plaintiff.  However, Chief Perry did not initiate any corrective action against Assistant Chief Asher.

46.     On or about August 25, 2011, Plaintiff met with Chief Perry to inform him of a verbal complaint he received from the same female officer regarding Assistant Chief Asher's discriminatory treatment of her and his creation of a hostile work environment.  At this time, Plaintiff informed Chief Perry that acts of discrimination and retaliation were still taking place and recommended that a formal investigation be initiated.

47.     At Plaintiff's request, Deputy County Attorney Justin Kollar ("Mr. Kollar") attended the August 25, 2011 meeting.

48.     By October 2011, Chief Perry did not authorize an investigation to be initiated regarding Plaintiff's reports of discrimination and a hostile work environment.

49.     On or about October 3, 2011, Plaintiff submitted a formal memorandum to Chief Perry, summarizing the female officer's allegations, and

again requested that a formal investigation be initiated and appropriate action be taken.

50.    Following Plaintiff's memorandum of October 3, 2011, Chief Perry held two meetings with the female officer to attempt to dissuade her from pursuing an investigation against Assistant Chief Asher.

51.    After Chief Perry failed to dissuade the female officer from pursuing a formal complaint, Chief Perry finally authorized a formal investigation.  However, Chief Perry improperly attempted to manipulate the selection of an investigator who he knew would be favorable to himself and KPD.

52.    Notwithstanding Chief Perry's attempts to manipulate the investigation, Plaintiff conducted a formal procurement process, in accordance with state law to select a neutral and unbiased third-party investigator.

53.    Chief Perry purposefully excluded Plaintiff from various meetings and communications with his subordinates, including administrative and operational matters that Plaintiff had been directly involved in, without justification.  Chief Perry bypassed the Chain of Command protocol in doing this.

54.    On or about December 16, 2011, Chief Perry summarily removed Plaintiff from his frequent role as Acting Deputy Chief and Acting Chief of Police.

55.    Chief Perry did not express to Plaintiff any dissatisfaction of his work performance prior to Plaintiff's reporting of the female officer's discrimination

complaints, and Plaintiff always received the highest ratings in his job performance reviews.

56.     As a result of Chief Perry's removal of Plaintiff's acting roles, Plaintiff suffered a loss of pay and career opportunities.

57.     On or about December 21, 2011, Chief Perry ordered Criminal Intelligence Unit ("CIU") personnel to remove a confidential police surveillance van from Plaintiff's private, fenced and gated farm.  With KPD's knowledge and permission, Plaintiff had housed this important vehicle, which was used for clandestine law enforcement operations on his gated farm, in order to avoid discovery by criminal elements.  Without explanation, Chief Perry ordered CIU personnel to deliver the surveillance van to a civilian KPD employee's unsecured residential property.

58.     On or about January 26, 2012, KPD held a senior staff meeting.  At the KPD senior staff meeting, which included Mr. Kollar, Plaintiff requested that Assistant Chief Asher step out of the meeting and informed Assistant Chief Quibilan and Chief Perry, that the female officer filed a formal complaint with the County Mayor's office against them regarding the sex discrimination and harassment she suffered.  Plaintiff also informed the Assistant Chiefs and Chief Perry that the female officer was not comfortable with their presence in her immediate area, and asked that they avoid initiating contact with her.

59.     In or around January/February 2012, Chief Perry and Deputy Chief Contrades issued orders prohibiting members of KPD's Vice Unit, Criminal Intelligence Unit, and Internal Affairs Unit from briefing Plaintiff on case updates or discussing their police investigations with him.  Plaintiff had been actively involved with and supervising many of these investigations for over a year.  Chief Perry and Deputy Chief Contrades issued these orders with the intent of excluding and isolating Plaintiff from effectively and adequately carrying out his duties as a Police Inspector.  Neither Chief Perry nor Deputy Chief Contrades gave Plaintiff any explanation as to why these exclusionary orders were given.

60.     In response to these above-described protected activities, the KPD, by and through its agents, Chief Perry, Assistant Chief Asher, and Deputy Chief Contrades, engaged in discriminatory acts of retaliation in violation of Title VII at U.S.C.A. § 2000e-3(a) and Hawaii Revised Statutes §§ 378-2(2) and 378-2(3).

61.     As a result of the pending investigation into the female officer's complaint filed with the County Mayor's office, Chief Perry unilaterally walked off the job and voluntarily surrendered his police credentials to the Criminal Intelligence Unit officers.  Thereafter, he was suspended by the Mayor for a week and was placed on paid leave from the KPD.  Pursuant to KPD procedures, Plaintiff's assigned bureau took receipt and secured control of Chief Perry's gun,

badge, police credentials, and work keys. Plaintiff was specifically instructed by the County Mayor's office not to return these items to Chief Perry.

62. On or about February 22, 2012, Chief Perry's work status remained on paid leave pending investigation. On this date, Chief Perry attempted to prematurely return to work, causing significant disruption to police operations. He approached Plaintiff at the Emergency Operations Center in Lihue, accompanied by two of his personal friends who were Police Commissioners, Charlie Iona ("Commissioner Iona") and Chairman Kanekoa. Chief Perry, repeatedly and unlawfully, ordered Plaintiff to return his work materials, i.e., his gun, badge, etc. Plaintiff informed Chief Perry that he received orders from the Mayor's office not to reissue Chief Perry's equipment, and reminded Chief Perry he was still on paid leave pending the investigation. Plaintiff asked Chief Perry to contact the Mayor's office. Commissioner Iona tried to persuade Plaintiff to comply with Chief Perry's request. Plaintiff did not comply with their requests due to orders from the Mayor and in support of the external investigation being conducted into the female officer's charges of discrimination and harassment by the County and its agents.

63. Chief Perry repeated three times his order for Plaintiff to return his police equipment and credentials. He told Plaintiff that he was "breaking the law", and emphasized that he had disobeyed three orders. Based upon a section of the KPD Standards of Conduct manual, disobedience of the repeated orders is grounds

for termination. Plaintiff informed Chief Perry of his perception that Chief Perry would attempt to terminate Plaintiff's employment upon his return to work, to which Chief Perry responded that he was not back yet. The two Police Commissioners began to walk away. However, Captain Henry Barriga ("Captain Barriga") and Mr. Kollar had witnessed these events and remained nearby. Chief Perry walked to an area outside of his office at KPD headquarters and set up a make-shift office. Chief Perry then initiated interviews with news reporters from Oahu and involved himself in police operations.

64.     On or about February 22, 2012, statewide news agencies televised their interviews with Chief Perry. During these interviews, Chief Perry stated that "Mark Begley" disobeyed his orders. Plaintiff felt disparaged, demeaned and embarrassed to see and know that he was being accused of disobeying orders on statewide television broadcasts. In contrast, Chief Perry publicly praised Assistant Chiefs Asher and Quibilan, although both were under investigation at the time.

65.     On or about February 29, 2012, Chief Perry's wife, Ms. Perry, testified publicly in front of the County Council stating that Plaintiff was insubordinate. The County Attorney was present at the meeting and publicly advised the County Council to not to allow Ms. Perry to testify. The County Council ignored and/or disregarded its own counsel's legal advice and allowed Ms. Perry's televised testimony to continue. Speaking on behalf of Chief Perry in his

official capacity, Ms. Perry stated that Chief Perry would not accept any return-to-work option that prohibited him from taking disciplinary action against Plaintiff and Captain Barriga.  Ms. Perry's testimony was aired numerous times on television, and was available on the internet at the County website.  Plaintiff was not given any due process prior to Ms. Perry's testimony before the County Council.  Following this County Council meeting, Chief Perry and Ms. Perry approached individual County Council members and berated and disparaged Plaintiff and his actions as a police inspector.

66.     On or about March 5, 2012, Chairman Kanekoa, a personal friend of Chief Perry, issued a notice to Plaintiff informing him that Ms. Perry filed a formal complaint against Plaintiff with regard to the February 22, 2012 incident. However, Ms. Perry was not present on February 22, 2012, when the events occurred.  In her complaint, Ms. Perry made false and disparaging accusations against Plaintiff and demanded Plaintiff's "immediate removal".

67.     Chairman Kanekoa notified Plaintiff that the Police Commission would be investigating the complaint and gave Plaintiff a deadline of March 14, 2012 to respond to the notice of complaint. Though Chairman Kanekoa and Commissioner Iona were listed as witnesses in Ms. Perry's complaint, neither Commissioner recused themselves from the matter.   Plaintiff timely submitted his written response; however, he has not received any further disposition from the

Police Commission on this matter. To this day, this frivolous investigation remains open and unresolved.

68.     In addition to moving forward with Ms. Perry's complaint, Chairman Kanekoa sent a letter to Deputy Chief Contrades which provided him a copy of Ms. Perry's complaint and requested the KPD's assistance in investigating the matter.

69.     On March 12, 2012, Chief Perry returned to duty from paid leave. On or about this date, Chief Perry continued to disparage Plaintiff by circulating private medical information to others regarding Plaintiff having sustained permanent brain damage from a head injury in 2002. Chief Perry's disclosure of Plaintiff's confidential medical history was done without Plaintiff's knowledge and consent and was done to discredit Plaintiff and further dissuade any support for the female officer's formal charge of discrimination and harassment. Chief Perry falsely told others that Plaintiff was never cleared for full duty as a police officer following his injury. However, Plaintiff was cleared for full duty by his neurologist on June 26, 2007. Confidential medical information about Plaintiff's brain damage was also published in the local newspaper from an unidentified source during this time frame. There was no justifiable reason for Chief Perry to comment or otherwise disclose to the public Plaintiff's brain injury or medical status.

70.     On April 2, 2012 Lieutenant Applegate initiated an internal investigation against Plaintiff for allegedly padding his overtime (KPD-IA-12-04), based upon Deputy Chief Contrades' instructions.

71.     On April 4 and 5, 2012, Plaintiff provided further testimony and evidence in the County's investigation into the female officer's complaint of discrimination and harassment.  Prior to giving such testimony, Plaintiff was scheduled to retrieve documents from the County IT office to assist in his testimony in the ongoing investigation.  Plaintiff met with the appropriate IT manager to facilitate the retrieval.  During that meeting, the IT manager informed Plaintiff that Chief Perry indicated to him that Plaintiff should not be trusted and that he should monitor Plaintiff during the retrieval.  The IT manager monitored Plaintiff while Plaintiff retrieved his work files and e-mails from an archived County hard drive.

72.     On April 10, 2012, Captain Perez issued a memo to Chief Perry claiming that Officer Abbatiello was afraid of Plaintiff.

73.     On or about May 14, 2012, Deputy Chief Contrades issued an official letter to Plaintiff, notifying him of a list of disciplinary charges against him based on the February 22, 2012 incident.  Chief Perry, by and through Deputy Chief Contrades and others, initiated disciplinary proceedings against Plaintiff, and a disciplinary hearing was scheduled before KPD's Administrative Review Board

("ARB"). The list of frivolous charges against Plaintiff included serious and terminable offenses.

74. The KPD's ARB consists of the Deputy Chief of Police (who is an at-will employee selected by the Chief of Police), three Assistant Chiefs (which included Assistant Chiefs Asher and Quibilan), and three Captains (only one of which was available for ARB hearings at that time). The ARB conducts disciplinary hearings, and then forwards its recommendation to the Chief of Police for his/her final decision or action. The ARB however, was not designed for disciplinary hearings/actions against Police Inspectors/Assistant Chiefs. In addition, KPD did not have sufficient senior staff to make quorum for an ARB hearing against Plaintiff.

75. On or about May 24, 2012, Assistant Chief Asher issued an official letter to Plaintiff, notifying him that the disciplinary hearing before the ARB was postponed, and that the ARB would notify Plaintiff when a new hearing date was set.

76. On June 1, 2012, Lt. Applegate issued a memo to Sergeant Ke to initiate an internal investigation against Plaintiff for the overtime padding investigation (KPD-IA-12-04).

77. On June 4, 2012, Lieutenant Applegate issued a memo to Sergeant Ke which instructed him to open a new Administrative Investigation (KPD-IA-12-09)

against Plaintiff for allegedly releasing confidential information regarding KPD Dispatcher Kristen Long.

78.     On the same day, Sergeant Ke sent a letter to Plaintiff notifying him that internal investigation (KPD-IA-12-09) had been initiated against him.

79.     On the same day, Sergeant Ke sent a letter to Plaintiff notifying him that internal investigation (KPD-IA-12-04) had been initiated against him.

80.     On or about June 14, 2012, Deputy Chief Contrades issued a letter to Plaintiff, informing him that the disciplinary proceedings against him were still ongoing, and that the ARB would notify Plaintiff when a new hearing date was set. Included with Deputy Chief Contrades' letter was a May 9, 2012 Notice of Disciplinary Action ("NDA") from Chief Perry, listing multiple and terminable charges against Plaintiff allegedly relating to the February 22, 2012 incident.  In his NDA, Chief Perry made false and disparaging statements regarding Plaintiff's comments and demeanor during the February 22, 2012 incident.

81.     On or about June 18, 2012, Thera Bradshaw, Executive Director of the State E911 Board, notified Plaintiff that Chief Perry directed her to remove Plaintiff from the State E911 Finance Committee, and to replace him with Captain Perez.  Chief Perry did not have authority to make changes to the committee structures of the State E911 Board. After Ms. Bradshaw sought guidance from the State Attorney General's office, no changes were made to Plaintiff's status on the

E911 Board and Committees.  Nevertheless, Plaintiff felt a significant amount of stress and anxiety as a result of all of these incidences.

82.     On June 19, 2012, Captain Perez sent an email to Chief Perry confirming that he saw Plaintiff at the E911 Board meeting in Honolulu

83.     On or about July 15, 2012, Plaintiff was informed that Chief Perry ordered Criminal Intelligence Unit officers to conduct video and photo surveillance at an event where Plaintiff was publicly showing his support for a political candidate.  Such improper covert surveillance operations conduct by KPD as a result of Chief Perry's orders continues to this day.

84.     On July 16, 2012, Captain Perez issued a memo to Chief Perry indicating that he saw Plaintiff at the E911 Board Meeting in Honolulu.

85.     During the month of July 2012, a freelance reporter, Joan Conrow, publicly criticized Plaintiff's workers' compensation medical leave after receiving confidential information about Plaintiff's medical status from Chief Perry.  Chief Perry disclosed private medical information without Plaintiff's knowledge and consent.  Ms. Conrow published this information on her internet blog website, Kauai Eclectic.  Ms. Conrow also published false information on her website about Plaintiff's actions during the time an outside investigator was being retained and the investigation into the discrimination complaints by the female police officer was being commenced.

86.     On or about August 8, 2012, Plaintiff was informed that Chief Perry ordered KPD Internal Affairs Unit officers to search for any wrongdoing by Plaintiff that was unrelated to the discrimination complaints and investigation.

87.     Chief Perry ordered, conducted, and managed police surveillance of Plaintiff and his whereabouts, evidenced by emails between Chief Perry, Captain Perez, and others.

88.     Chief Perry intentionally violated Plaintiff's medical privacy and due process rights by inappropriately mailing numerous confidential medical and employment documents and reports to the State of Hawai'i Department of Labor ("Department of Labor").  Chief Perry's mailing was unsolicited by the Department of Labor and done without Plaintiff's knowledge or consent.  Chief Perry's letters to the Department of Labor contained false statements and mischaracterizations of Plaintiff's actions and medical condition, and at the same time, omitted significant, relevant information.

89.     Chief Perry attempted to manufacture civil and criminal cases against Plaintiff, including Chief Perry's desire to personally order an "expeditious" criminal investigation against Plaintiff.  This is despite the fact that Plaintiff did not violate any laws, rules or codes of conduct.

90.     Chief Perry repeatedly interfered with and intentionally sought to jeopardize Plaintiff's ability to receive workers' compensation benefits from the

Kauai County and otherwise deprive him of such economic benefits, as evidenced by various comments, or omissions thereof, and letters Chief Perry sent to Brandovald Ku, Inc. (the County's workers' compensation adjuster) and the Department of Labor regarding Plaintiff's participation in the State's E911 Board seeking to convince them to pursue fraud charges against Plaintiff.

91.     On November 8, 2012, Captain Perez sent a memo to Chief Perry via Deputy Chief Contrades regarding Plaintiff's attendance at the November 5, 2012 E911 Board meeting.  In addition to the memo, Captain Perez included the agenda/meeting minutes for the meeting and a picture of Plaintiff while on the flight to Honolulu for the meeting.

92.     On November 14, 2012, Captain Perez sent an email to Chief Perry to confirm that Plaintiff attended the E911 Board meeting.

93.     On or about November 16, 2012, Plaintiff received an undated letter from Deputy Chief Contrades.  Deputy Chief Contrades ordered Plaintiff to return his KPD issued identification card along with other personnel items.  No legitimate reason or explanation was given to Plaintiff.  Plaintiff was not suspended from work nor placed on leave, pending any type of internal personnel investigation. Deputy Chief Contrades gave Plaintiff short notice to return certain personnel items under threat of disciplinary action.  Deputy Chief Contrades claimed his order was pursuant to "department directives", but he did not identify a specific

KPD directive. Deputy Chief Contrades demanded a copy of Plaintiff's keys to his office, desk and police assigned vehicle. However, KPD already had a copy of those keys. In fact, another KPD officer had access to and had been using Plaintiff's assigned police vehicle in Plaintiff's absence. Furthermore, Captain Perez had access to and had been using Plaintiff's office and files for several months. KPD also had a complete copy of Plaintiff's work hard drive and work files contained therein.

94. Deputy Chief Contrades then ordered Plaintiff to turn over the "VisionAir Contract", a lengthy contract for 911 services that Plaintiff completed prior to taking leave from KPD. The County's Purchasing Division ("Purchasing Division") is responsible for maintaining copies of all County contracts. The VisionAir Contract was on file with the Purchasing Division. During a subsequent meeting with Captain Perez, Captain Perez acknowledged to Plaintiff that he was aware the Purchasing Division had the VisionAir Contract.

95. On or about April 12, 2013, the EEOC gave the County notice of further investigation against the KPD after Plaintiff complained about continuing retaliation by the KPD and its employees.

96. On or about April 15, 2013 Deputy Chief Contrades issued a memorandum to Lieutenant Applegate which ordered an internal investigation

(KPD-IA-13-09) against Plaintiff involving allegations that Plaintiff did not allow employees to be paid meals when conducting overtime beyond two hours.

97.　　On May 16, 2013, Assistant Chief Quibilan sent an email to Chief Perry and Deputy Chief Contrades notifying them of an alleged incident involving Plaintiff at a E911 Board meeting.  In his email and though he was not present in the meeting, Assistant Chief Quibilan claimed that Plaintiff got into an altercation with another E911 Board member.

98.　　On May 20, 2013 Chief Perry issued a memo to Lieutenant Applegate and requested that an internal investigation be initiated against Plaintiff for an alleged disturbance at an E911 Board Meeting.

99.　　 During the time of June 4-5, 2013, Deputy Chief Contrades issued four (4) new NDAs against Plaintiff. [4] For each NDA, Lieutenant Applegate sent a letter to Plaintiff notifying him of the complaint.

100.　On June 24, 2013 Plaintiff received a manila envelope from Deputy Chief Contrades.  The envelope contained official notices to Plaintiff that KPD had

---

[4] NDA-12-08 – Alleging Plaintiff failed to provide weekly reports in February 2012 to Deputy Chief Contrades.
NDA-12-09 – Alleging Plaintiff failed to submit a report following a November 29, 2011 ARB hearing.
NDA-12-10 – Alleging Plaintiff failed to keep Deputy Chief Contrades informed of any major event while Deputy Chief Contrades was on the mainland in February 2012.
NDA-13-05 – Alleging Plaintiff made false statements to G. Todd Withy, Esq. who was conducting the outside investigation into Officer Abbatiello's complaint.

initiated three (3) new and separate administrative investigations against Plaintiff, as well as five (5) new and separate disciplinary hearings against Plaintiff. Each of these eight (8) disciplinary notices contained multiple charges against Plaintiff that were considered terminable offenses.

101. On September 18, 2013, Chief Perry sent a letter to Acting Assistant Chief Chong Tim directing him to conduct a forensic data retrieval on Plaintiff's computer hard drive.

102. On October 3, 2013, Officers Ledesma, Williamson and Jenkins were caught conducting surveillance on Plaintiff. The information they provided Chief Perry led to Chief Perry sending a letter to William Aila, Jr., Chairperson of the Department of Land and Natural Resources involving Plaintiff.

103. On October 16, 2013 Officer Abbatiello submitted a memo to Sergeant Ke regarding Plaintiff. Officer Abbatiello claimed that Plaintiff was pulled over by a patrol officer and "badged" the officer.

104. On that same day, Sergeant Ke issued a memo to Chief Perry through Deputy Chief Contrades and Lieutenant Applegate concerning the "badging incident".

105. On October 17, 2013, Deputy Chief Contrades issued a memo to Lieutenant Applegate instructing him to initiate an internal investigation against Plaintiff relating to the badging incident.

106. On December 6, 2013 Plaintiff was served a copy of the Eric Shibuya lawsuit, which named Plaintiff as a defendant, and made defamatory and baseless accusations against Plaintiff. The lawsuit and its exhibits revealed that Chief Perry had directly instigated the lawsuit against Plaintiff, and had informed Shibuya that Chief Perry and Shibuya shared a common enemy, i.e., Plaintiff. This lawsuit remains pending.

107. On May 20, 2014, Sergeant Ke initiated ADM2014-0259 against Plaintiff. It is unclear as to the allegations because it states: "This report contains sensitive information and should be reviewed only if there is a need to know/right to know."

108. On October 7, 2014, Officer Abbatiello issued a memorandum to Sergeant Miller claiming that she received a report that Plaintiff was committing animal cruelty to his pet dog.

109. On November 25, 2014, Sergeant Miller sent a memo to Chief Perry via Deputy Chief Contrades forwarding Officer Abbatiello's memorandum.

110. On December 12, 2014, Chief Perry via Deputy Chief Contrades issued a memo to Sergeant Miller requesting that he initiate an internal investigation regarding animal cruelty against Plaintiff (ADM2014-0445).

111. In addition, the acts and pattern of retaliation continue to this day. Currently, the County via illegal and unlawful means is attempting to force

Plaintiff into its Return to Work Program ("RTWP") in an effort to end his employment with KPD and force him into a different line of work. If Plaintiff refuses to participate in the RTWP, the County will terminate his employment.

112. The County's efforts to terminate Plaintiff began in November 2014, while Plaintiff remained out of work due to a mental stress claim that was accepted by the County.

113. On November 11, 2014, Acting Director Takatsuki sent a letter to Plaintiff to schedule a meeting to discuss the RTWP, since he claimed that Plaintiff was unable to return to his prior position.

114. However, prior to Acting Director Takatsuki's November 11, 2014 letter, the County knew that its efforts to use the RTWP was inappropriate based upon a prior decision from the Department of Labor and Industrial Relations, Disability Compensation Division.

115. On or about February 9, 2015, Director Rapozo sent a letter to Plaintiff threatening termination if he did not appear for a February 19, 2015 meeting to discuss the RTWP.

116. Under the threat of termination Plaintiff attended the February 19, 2015 meeting with Ms. Niitani who was a Human Resource Specialist with the County.

117.   During the meeting, Ms. Niitani refused to consider updated information from Plaintiff's doctor and his attorneys and proceeded with the meeting.

118.   In furtherance of the County's and KPD's effort to terminate Plaintiff's employment, Chief Perry sent a February 2, 2016 letter to Plaintiff indicating that the County and KPD would begin the process of terminating Plaintiff's employment.  Chief Perry's letter however, was subsequently rescinded when the County and KPD realized that the letter was in violation of the Fifth Circuit's preliminary injunction order filed on October 23, 2015.

119.   Notwithstanding the EEOC's investigation and its findings of reasonable cause, the County and KPD have refused or otherwise failed to provide Plaintiff a safe working environment, free from retaliation which could provide Plaintiff with the opportunity to return to his police position.

**COUNT I - RETALIATION IN VIOLATION OF
TITLE VII, U.S.C.A. § 2000e-3(a) AND
HAWAII REVISED STATUTES §§ 368 AND  378-2(2)**
(Defendant County of Kauai, Kauai Police Department)

120.   Plaintiff realleges and reincorporates by reference paragraphs 1 through 119 above with the same force and effect as fully set out in specific detail here.

121.   Defendants County and KPD, by and through their agents, including but not limited to Defendants Chief Perry, Deputy Chief Contrades, and Assistant

Chief Asher, unlawfully retaliated against Plaintiff for *inter alia*, assisting, supporting, and reporting a female KPD officer's complaint of sex discrimination and sexual harassment against Defendants County, KPD, and its agents.

122.   This retaliation was done maliciously, willfully, and with reckless disregard for the rights of Plaintiff.

123.   Defendants County and KPD failed to provide Plaintiff with employment conditions where he could safely work, free from illegal discrimination, thereby creating a hostile work environment.

124.   Defendants County and KPD failed to take prompt and effective remedial action to prevent or put an end to the discrimination and retaliation as described hereinabove.

125.   As a result of the foregoing acts, omissions, and conduct, Plaintiff has suffered extreme anguish, pain, emotional distress, humiliation, damage to his reputation, loss of income and other general and special damages in amounts to be proven at trial, and is entitled to all equitable and legal remedies and damages, including but not limited to, all, relief as allowed under Title VII and HRS §§ 368 and 378.

126.   Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged, and this suit for back pay, declaratory judgment, injunction

relief and compensatory and punitive damages is his only means of securing

adequate relief.

127.   Plaintiff is now suffering and will continue to suffer irreparable injury

from Defendants County's and KPD's unlawful conduct as set forth above unless

Defendants County and KPD is enjoined by this Court, as requested below.

## COUNT II - AIDING AND ABETTING RETALIATION IN VIOLATION OF HAWAII REVISED STATUES §§ 368 AND 378-2(3)
### (Defendants Darryl Perry, Roy Asher, and Michael Contrades)

128.   Plaintiff realleges and reincorporates by reference paragraphs 1

through 127 above with the same force and effect as fully set out in specific detail

here.

129.   Hawaii Revised Statutes ("HRS") § 378-2(3) provides in pertinent

part:

> It shall be an unlawful discriminatory practice:
>
> (3) For any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any discriminatory practices forbidden by this part, or attempt to do so[.]

By reason of the acts, omissions, and conduct hereinabove alleged,

Defendants Chief Perry, Assistant Chief Asher, and Deputy Chief Contrades

("Individual Defendants") aided, abetted, incited, compelled, and/or coerced the

doing of the aforesaid discriminatory practices in violation of HRS § 378-2(a)(3).

The Individual Defendants are individually liable for their intentional, illegal conduct pursuant to Hawai'i law.

130.   As a consequence of the foregoing aiding and abetting and wrongful conduct by the Individual Defendants, Plaintiff has been subjected to a hostile work environment, suffered extreme anguish, pain, emotional distress, humiliation, damage to his reputation, loss of income and other general and special damages in amounts to be proven at trial, and is entitled to all equitable and legal remedies and damages, including but not limited to all relief as allowed under HRS §§ 368 and 378.

131.   As a consequence of the foregoing aiding and abetting by the Individual Defendants, they are individually liable for Plaintiff's damages.

## COUNT III - VIOLATION OF WHISTLEBLOWER PROTECTION ACT
### (Defendant County of Kauai, Kauai Police Department)

132.   Plaintiff realleges and reincorporates by reference paragraphs 1 through 131 above with the same force and effect as fully set out in specific detail here.

133.   Plaintiff engaged in protected conduct as defined in Hawaii's Whistleblowers' Protection Act HRS § 378-61 et seq. ("WPA").

134.   Defendants County and KPD have taken numerous adverse actions against Plaintiff by threatening, retaliating and/or otherwise discriminating against Plaintiffs as a result of Plaintiff engaging in protected conduct under the WPA.

135. The conduct of Defendants County and KPD was in violation of the WPA and the conduct remains ongoing.

136. As a result thereof, Plaintiff is entitled to the statutory remedies under the WPA.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(All Defendants)

137. Plaintiff realleges and reincorporates by reference paragraphs 1 through 136 above with the same force and effect as fully set out in specific detail here.

138. All Defendants herein named have engaged in extreme and outrageous behavior towards Plaintiff. The aforementioned actions constitute a pattern of illegal conduct that remains ongoing. Defendants' actions as described above were done with malice and with the intent to cause, or the knowledge that it would cause, severe emotional and mental distress to Plaintiff.

139. As a result thereof, Plaintiff has suffered and continues to suffer severe emotional and mental distress, thereby entitling Plaintiff to relief related thereto, as stated herein, including an award of special, general, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in amounts in excess of the minimum jurisdictional requirements of this Court against the above-named Defendants as follows:

1.     Grant Plaintiff a permanent injunction, enjoining Defendants County and KPD, its agents, successors, employees, attorneys and those acting in concert with Defendants County and KPD and at Defendants County and KPD request, from continuing to violate Title VII and HRS §§ 368 and 378 and/or taking any adverse actions against Plaintiff;

2.     Grant Plaintiff an order requiring Defendant KPD to make Plaintiff whole by awarding Plaintiff placement into the position Plaintiff would have occupied in the absence of the unlawful retaliation by Defendants for Plaintiff's opposition to the unlawful discrimination against a female KPD police officer, with the same seniority, leave and other benefits of the position (or front pay), back pay (with interest) and any other equitable relief appropriate under the circumstances;

3.     Grant Plaintiff compensatory damages, including damages for emotional distress, in an amount to be determined at trial;

4.     Grant Plaintiff punitive damages in an amount to be determined at trial;

5.      Grant Plaintiff relief pursuant to HRS §§ 368-17 and 378-61 et seq.

6.      Award Plaintiff such other relief and benefit as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees pursuant to 42 U.S.C.A. § 2000e-5(k) and/or HRS §§ 378-5 and 368-17, and expenses; and

7.      Prejudgment interest from the date of the first unlawful act by any Defendant herein named, and such other and further relief as this Court deems just and proper.

Dated:          Honolulu, Hawaii, February 15, 2018.

/s/ Lyle S. Hosoda
LYLE S. HOSODA
KEVIN T. MORIKONE
KRISTEN A. YAMAMOTO

Attorneys for Plaintiff
MARK N. BEGLEY