1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3
   MARK N. BEGLEY,                ) CIVIL NO. 16-00350LEK-KJM
4                                 )
            Plaintiff,            ) Honolulu, Hawaii
5                                 ) September 1, 2017
        vs.                       )
6                                 )
   COUNTY OF KAUAI, KAUAI         ) [155] PLAINTIFF MARK N.
7  POLICE DEPARTMENT; DARRYL      )  BEGLEY'S MOTION TO
   PERRY; ROY ASHER; MICHAEL      )  DISQUALIFY COUNTY OF KAUAI,
8  CONTRADES; SOLETTE PERRY;      )  OFFICE OF THE COUNTY
   ERNEST KANEKOA, JR.; PAUL      )  ATTORNEY
9  APPLEGATE; ELLIOTT KE;         )
   SHERWIN PEREZ; ALEJANDRE       )
10 QUIBILAN; DARLA ABBATIELLO;    )
   JAMES MILLER; RANDOLPH         )
11 CHONG TIM, SR.; BRANDY         )
   LEDESMA; SCOTT WILLIAMSON;     )
12 CHRISTIAN JENKINS; THOMAS      )
   TAKATSUKI; JANINE RAPOZO;      )
13 JILL NIITANI; AND DOE          )
   DEFENDANTS 16-100,             )
14                                )
            Defendants.           )
15 _____  )

16
                TRANSCRIPT OF PROCEEDINGS
17       BEFORE THE HONORABLE KENNETH J. MANSFIELD,
              UNITED STATES MAGISTRATE JUDGE
18
   APPEARANCES:
19
   For the Plaintiff:        LYLE S. HOSODA, ESQ.
20                           KRISTEN A. YAMAMOTO, ESQ.
                             HOSODA & MORIKONE, LLC
21                           Three Waterfront Plaza, Suite 499
                             500 Ala Moana Boulevard
22                           Honolulu, Hawaii  96813

23
   For Defendant County      ADAM P. ROVERSI, ESQ.
24 of Kauai, Kauai Police    Office of the County Attorney
   Department:               4444 Rice Street, Suite 220
25                           Lihue, Hawaii  96766

```
 1    APPEARANCES (Cont'd.):

 2    For Defendant Darryl      SINCLAIR SALAS-FERGUSON, ESQ.
      Perry, in his            Office of the County Attorney
 3    individual capacity:     4444 Rice Street, Suite 220
                               Lihue, Hawaii  96766
 4

 5    For Defendant Roy        MATTHEW M. BRACKEN, ESQ.
      Asher, in his            Office of the County Attorney
 6    individual capacity:     4444 Rice Street, Suite 220
                               Lihue, Hawaii  96766
 7

 8    For Defendant Michael    MARK L. BRADBURY, ESQ.
      Contrades, in his        Office of the County Attorney
 9    individual capacity:     4444 Rice Street, Suite 220
                               Lihue, Hawaii  96766
10

11    For Defendants           PETER M. MORIMOTO, ESQ.
      Alejandre Quibilan;      Office of the County Attorney
12    Darla Abbatiello; Jill   4444 Rice Street, Suite 220
      Niitani; Ernest          Lihue, Hawaii  96766
13    Kanekoa; Elliott Ke;
      Sherwin Perez; James
14    Miller; Randolph
      Chong Tim; Brandy
15    Ledesma; Scott
      Williamson; Christian
16    Jenkins; Thomas
      Takatsuki, and Janine
17    Rapozo, in their
      individual capacities:
18

19

20    Official Court          Cynthia Fazio, RMR, CRR, CRC
      Transcriber:            United States District Court
21                            300 Ala Moana Blvd., C-270
                              Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by electronic sound recording, transcript
25    produced with computer-aided transcription (CAT).
```

1    FRIDAY, SEPTEMBER 1, 2017                          9:30 A.M.

2            THE COURTROOM MANAGER:  Civil Case Number

3    16-00350LEK-KJM, Mark N. Begley versus County of Kauai, Kauai

4    Police Department, et al.

5            This hearing has been called on a Motion to Disqualify

6    Counsel.

7            Counsel, your appearances for the record, please.

8            MR. HOSODA:  Good morning, Your Honor.  Lyle Hosoda

9    and Kristen Yamamoto appearing on behalf of the

10   plaintiff-movant Mark Begley.

11           THE COURT:  Good morning.

12           MR. MORIMOTO:  Peter Morimoto on behalf of

13   defendants -- well, there's 14 of them.  Do you want me to read

14   them all, Your Honor?

15           THE COURT:  I do.

16           MR. MORIMOTO:  Okay.  Defendants Alejandre Quibilan,

17   Darla Abbatiello, Jill Niitani, Ernest Kanekoa, Elliott Ke,

18   Sherwin Perez, James Miller, Randolph Chong Tim, Brandy

19   Ledesma, Scott Williamson, Christian Jenkins, Thomas Takatsuki

20   and Janine Rapozo.

21           THE COURT:  Thank you.  Good morning.

22           MR. BRACKEN:  Good morning, Your Honor.  Matt Bracken

23   on behalf of Roy Asher, defendant Roy Asher in his individual

24   capacity.

25           THE COURT:  Good morning, sir.

1    MR. SALAS-FERGUSON:  And good morning, Your Honor.

2  Deputy County Attorney Sinclair Salas-Ferguson on behalf of

3  Darryl Perry in his individual capacity.

4    THE COURT:  Good morning.

5    UNIDENTIFIED MALE:  Morning.

6    MR. BRADBURY:  Good morning, Your Honor.  Mark

7  Bradbury on behalf of defendant Michael Contrades.

8    THE COURT:  Okay.  Good morning.

9    MR. ROVERSI:  Good morning, Your Honor.  On the phone

10  Adam Roversi, Deputy County Attorney, representing the County

11  of Kauai.

12    THE COURT:  Okay.  Great.  Good morning everyone.  You

13  folks can be seated.

14    I had one preliminary question.  The plaintiffs filed

15  an ex parte motion for leave to file Exhibit 88 under seal and

16  I hadn't ruled on that yet.  And I wanted to ask whether any of

17  the defendants object to that motion.

18    MR. BRACKEN:  No objection on behalf of Roy Asher,

19  Your Honor.

20    THE COURT:  Okay.  Mr. Morimoto?

21    MR. MORIMOTO:  No objection on behalf of my clients,

22  Your Honor.

23    THE COURT:  Mr. Sinclair Ferguson?

24    MR. SALAS-FERGUSON:  No objection, Your Honor.

25    MR. BRADBURY:  And no objection on behalf of Michael

1    Contrades.

2              THE COURT:  Okay.  And Mr. Roversi?

3              MR. ROVERSI:  No objection, Your Honor.

4              THE COURT:  Okay.  Thank you.  So then the Court

5    grants that ex parte motion, which was Document 171.  And leave

6    is granted to file Exhibit 88 under seal.

7              MR. HOSODA:  Thank you, Your Honor.

8              THE COURT:  You're welcome.

9              Other than that logistical issue, Mr. Hosoda, you can

10   proceed.  I'm familiar with the papers.  I have not read every

11   word of every exhibit, which I normally like to do, but I just

12   haven't gotten through all of the weeds, but I'm otherwise up

13   to speed.

14             MR. HOSODA:  Thank you very much, Your Honor.  With

15   that, I think this issue has been thoroughly and fully briefed.

16   Unless the Court has specific questions, I'm prepared to stand

17   on our briefs.

18             THE COURT:  Let me ask you, I do have questions.  In

19   my mind this case isn't on all fours with the Ragasa case, and

20   that I'm, as everyone knows, familiar with, and some of the

21   attorneys here today are very familiar with it.  But I -- I do

22   recall and believe that that situation was different than the

23   one we have here and do you care to comment on that?

24             MR. HOSODA:  Well, factually I would agree with you.

25             THE COURT:  Yeah.

1          MR. HOSODA:  But what Ragasa stands for is a couple

2    things.  First of all, timing and notice to the County.

3    Because First Deputy Mauna Kea Trask at the time is now the

4    County Attorney.  And so there's no question that they know.

5    Second -- about the conflict issue.

6          Second, in addition to the timing, you have the fact

7    that the standard, the standards for a non-client having

8    standing to make these claims was carefully and detailed laid

9    out.

10          THE COURT:  Yeah.  And I still feel that way that

11    under the right circumstances, a non-client should bring this

12    to the court's attention and the court should address it.

13          MR. HOSODA:  So that's what I think Ragasa is relied

14    on by the plaintiff.

15          Now, what I note and I did in my reply is that none of

16    the defendants even mentioned Ragasa.

17          THE COURT:  Right.

18          MR. HOSODA:  And instead they mentioned and cited to

19    Clark.  Clark was Judge Kobayashi's decision, but it was done

20    back in 2009 and there was no detail laid out for the standard

21    at all because that case involved a pro se.

22          THE COURT:  Right.

23          MR. HOSODA:  That filed an unsupported four-page

24    Motion to Disqualify.

25          THE COURT:  Right.

1       MR. HOSODA:  So we believe that Ragasa stands for,
2  here's the standard for standing.
3       I do assert and we do argue that because my client is
4  an existing employee of the County and received legal advice
5  and counsel throughout, that he is a client and former client
6  and has standing on that alone as an aggrieved.  But in
7  addition to that, even if you determine that he's a non-client,
8  if you do the analysis in Ragasa, we believe that still he has
9  standing to bring this motion.
10      THE COURT:  Okay.  And so I take it you disagree with
11  the defendant's contention, if I'm understanding it correctly,
12  that Mr. Begley was not a client in -- in sort of the
13  traditional sense of an attorney-client relationship, at least
14  as to the advice he may have received during the underlying
15  facts here.  As I understand the defendants' position is
16  saying, well, it's sort of the organizational client and they
17  were giving lots of advice to lots of people when these events
18  were transpiring.  It sounded like they were advising
19  Mr. Begley, they were advising Chief Perry, they were advising
20  the mayor, they were advising everybody, but -- and I'll
21  certainly give all of them a chance to speak to this.
22      As I understand it that they're saying, well,
23  Mr. Begley wasn't a client in the traditional sense, he was
24  more like an employee of a client in the more traditional
25  sense.  And even if that's not the case, well, the lawyers who

1   advised him left the office and there was either no overlap or

2   minimal overlap with the lawyers now involved.  If you could

3   comment on that.

4          MR. HOSODA:  Sure.

5          THE COURT:  Yeah.

6          MR. HOSODA:  I think that's at the crux of this.

7          THE COURT:  Yeah.

8          MR. HOSODA:  And that's information.  And I think that

9   your -- what you're looking at for everybody's perspective is,

10  well, how are people made aware of whether you're a client or

11  not.

12         THE COURT:  Right.

13         MR. HOSODA:  And you have my client's declaration that

14  clearly said he felt that he was seeking legal advice and that

15  they were rendering legal advice to him as an individual.

16         THE COURT:  Right.

17         MR. HOSODA:  When we got into the depositions that I

18  really ask the Court to read those two depositions.

19         THE COURT:  Yeah, I will.

20         MR. HOSODA:  Because they're very, very critical.  But

21  what happens is they take the position that he's a client.  And

22  they object and they instruct him not to answer.  Not

23  Mr. Begley.

24         THE COURT:  Right.

25         MR. HOSODA:  But they're taking the position that each

1   of these people that they advised.

2           THE COURT:  Mr. Castillo and Mr. --

3           MR. HOSODA:  Castillo and Mr. Guyot.

4           THE COURT:  -- Guyot.

5           MR. HOSODA:  That they are -- they were clients.  So

6   you cannot have it both ways.  That you're either a client or

7   you're not a client.  And what I think is critical is whether

8   or not the individuals are made aware of this.  And I think

9   that is really important with each of the defendants that's

10  brought into this case because do you sit down with them as

11  we're supposed to do under the Code of Professional

12  Responsibility and ask, What are all the facts?  And if you're

13  zealously representing your client, you go about getting facts

14  from every place that you can legally get them and you use them

15  to your client's benefit.  Have they explored each and every

16  one of those to the point where you bring cross-claims or

17  third-party claims on behalf of your client.  And I think that

18  that just hasn't been done.

19          But I think, Your Honor, the most important thing to

20  look at is the context of this entire dispute, which is we let

21  Your Honor know that every high level of office from the

22  mayor's office, HR, personal services, KPD, they're all

23  involved.  From the very beginning.  And Mauna Kea Trask,

24  deputy and then becomes the county.

25          If you're advising all of these different people,

1  using advice that -- and information that you're gathering from
2  each, I mean how are you going to wall off something like that
3  where you have 11 attorneys basically all housed in the same
4  spot, using the same staff, using the same computer system, as
5  we all do nowadays to access files, infected.  I mean it's just
6  tainted with information.  How could anybody get fair
7  representation under those circumstances?

8        THE COURT:  And do you think the standard is -- is any
9  different because they're government attorneys?

10       So I agree with you in a traditional law firm I would
11  say no way, you're all sharing office space, everything you
12  said, you're sharing staff, you're sharing computer systems,
13  that would never happen.  The County is, I think, acknowledging
14  their office setup.  Mr. Morimoto's is a little bit different,
15  but they're otherwise, I don't think, arguing with you over,
16  yeah, that's how they operate.

17       But I believe they believe they're entitled to operate
18  that way because they're County counsel, the same way the AG's
19  operate differently, the same way the U.S. Attorney's Office
20  can operate differently.  How do you address that?

21       MR. HOSODA:  Yeah, so I acknowledge the cases that
22  have been cited.

23       THE COURT:  Yeah.

24       MR. HOSODA:  But they're distinguished.  They're
25  distinguishable because when you're talking about the Attorney

1    General's Office, we've pointed this out in our brief, you're

2    talking about 500 attorneys with, you know, four times that in

3    staff and housed at various places around the island where you

4    can wall off specific individuals.  But here, as they've

5    acknowledged, it's -- those cases are clearly distinguishable

6    by the facts that went on in this case.  But again I point back

7    to the context.

8         THE COURT:  Yup.

9         MR. HOSODA:  Because this is so pervasive.  For the

10    last five years this is a significant event.  Mr. Castillo said

11    he had never experienced anything like this in his career where

12    the mayor relieves the Chief of Police from his duties.

13         So it was clearly the talk of the town.  And for the

14    count attorney's office who's rendering legal advice to the

15    police commission, HR, county counsel, I mean they're going

16    everywhere.  This was discussed everywhere.  We have e-mails,

17    we have -- we've presented a number of documents.  And

18    there's -- they're all talking about it.

19         Mauna Kea Trask would be remiss in his duties if he

20    wasn't watching over what was going on in each of these

21    different departments, different attorneys.  That's his job.

22    So we don't have a declaration from him.

23         But the information was being shared.  And how are you

24    protecting your client confidences under those circumstances?

25    Can't be done.

1       THE COURT:  Would it matter to you if there's a joint

2  defense agreement?  And I don't know whether there is.  I'm

3  just trying to think this through.  Whether it's among all

4  defendants or, for example, just Mr. Morimoto's 14 clients.

5       MR. HOSODA:  Well, a joint defense agreement would

6  work if everybody has been fully informed and advised of their

7  rights, but again, the standard I look at is, in this set of

8  facts and circumstances, if you have the ability to hire

9  whichever attorney that you wanted to, understanding that they

10  would -- the County would pay for it, that you didn't have to

11  pay for it, would they choose this representation and these --

12  this theme and theory that the defendants are espousing.  And I

13  don't think that they would.  Because under the circumstances

14  if you look at the evidence, I believe it's compelling and that

15  many of them would, without feeling the pressure from a County

16  attorney saying, hey, you're going to tow the County line.

17       THE COURT:  Right.

18       MR. HOSODA:  I think that, you know, that's not what's

19  happening here.

20       THE COURT:  Well, you're asking me to presume

21  something, right?  I mean we don't know that.  We don't know

22  that those discussions haven't taken place.  We, you know --

23  right?  I think in your papers and this morning you are asking

24  me to make some leaps.  I'm not saying they're illogical leaps,

25  but you're asking me to take some leaps.

1       MR. HOSODA:  Yeah, I am and what I'm saying is if you

2   look at the context of what's gone on since 2012 when, you

3   know, you have the mayor -- there's this power struggle, this

4   fight that went on that my client had no business being a part

5   of and got wedged in here where the County counsel, the County

6   attorney is advising Mark Begley, You have to follow the

7   mayor's orders.  You know, you're not to give the chief his

8   badge and gun back.  But then here comes the police commission

9   marching in saying, We have the authority.  There was no

10   decision made at that point and my client is sitting there

11   going like, What do I do, what do I do?  And so he follows the

12   County attorney's office as well as the mayor and then all of

13   this happens.

14       So, how can you be advising all of those different

15   entities and individuals and all of that information be stored

16   in notes, electronically, and then say that these new

17   individuals that come in, they have to go look at the notes.

18   That's their duty.  They have to look at files on what

19   happened.  Otherwise they're not zealously representing their

20   clients.

21       THE COURT:  And did you, I -- I skimmed the

22   depositions and it looked like you had some questions on that.

23   Did you ask and get an answer to the question about, is there a

24   file, Mr. Castillo, and you know, did you take notes during

25   this time period, and did you leave that summary, did you get

1   any specific answers on -- I think you asked those questions,

2   and what were the answers?

3           MR. HOSODA:  I did.  And he -- his basic testimony was

4   he left it to his individual deputies.  So he left it with

5   Mr. Guyot.

6           THE COURT:  Okay.

7           MR. HOSODA:  He said he didn't -- he wasn't one who as

8   a matter of practice kept notes and didn't recall, you know,

9   having any notes left in his file.

10          THE COURT:  Okay.  All right.  Thank you, sir.

11  There's five of you.  Who would like to go?

12          MR. MORIMOTO:  Your Honor, I think Mr. Roversi wanted

13  to start.

14          THE COURT:  Okay.  Mr. Roversi?

15          MR. ROVERSI:  Okay.  I would -- I would make -- since,

16  Your Honor, you asked about the Ragasa case.  I would make a

17  couple of points about that case.

18          So as we note, as Judge Kobayashi noted in her -- in

19  her opinion following the Ninth Circuit, we have a general rule

20  of no third-party standing to assert the sorts of claims that

21  are being asserted here to disqualify counsel.

22          So in the Ragasa case, and there's obviously an

23  exception to that general rule or -- egregious examples of

24  conflict.

25          The Ragasa case, as you well remember, involved a

1    defendant represented by Deputy County Attorney who admitted in

2    his depositions that he perjured himself and then alleged that

3    his declarations had been fabricated and cross-claims had been

4    filed without his permission.  And in that case, Your Honor,

5    you found that to be sort of an egregious example.  But I would

6    also point out the results of that was not the disqualification

7    of the County Attorney (indiscernible), but it was the Court's

8    disqualification of the specific Deputy County Attorney that

9    represented that specific defendant.  It was very fact specific

10   set of circumstances and a fact specific result.  It focused on

11   the single attorney whose involvement in the case had been

12   tainted and it was not an opportunity to impute

13   disqualification to the entire office as the plaintiff seeks to

14   do in this case.

15           That said, I would also generally direct the Court

16   to --

17           THE COURT:  Are you still there, Mr. Roversi?

18           MR. ROVERSI:  I --

19           THE COURT:  Okay.

20           MR. BRACKEN:  I am.  Let's see.  I'm quickly perusing

21   my --

22           THE COURT:  You can -- you can take your time.

23   Sometimes we have trouble and people drop off.  That's the only

24   reason I wanted to check.

25           MR. ROVERSI:  Sure.  You also mentioned that

1    plaintiff's counsel was actually asking you to make some leaps
2    and conclusions and I would point out that in the Kasza case
3    cited in the County's opposition brief, that's exactly the sort
4    of thing that court talked about in that case.  That the
5    plaintiff seeking to disqualify, in that case DOJ attorneys,
6    had nothing but conclusory charges of institutional conflict
7    around in the office, without any -- any specific claims of
8    actual injury or actual sharing of information.  And as -- as
9    yourself pointed out, the plaintiff's counsel is asking you to
10   make these conclusions in this case, having pointed out nothing
11   but similar institutional charges of conflict without any
12   demonstration that anything improper is actually going on.  Or
13   has gone on or is affected or tainted this case.

14        THE COURT:  Right.  And where I -- where I think the
15   plaintiff is asking me to make some leaps and where I don't
16   think he is, you know, depends on the issue.  So I think, for
17   example, when the plaintiff questions the litigation behavior
18   of the defendants and why they have done or haven't done
19   certain things, there's some speculation there.  And -- and
20   maybe there's good answers to -- to the strategy and maybe
21   there aren't.

22        But, for example, on the plaintiff's assertion that he
23   sought and received legal advice from the County during these
24   underlying events, there's no speculation there.  That is in --
25   in the declaration and those are very specific allegations.

```
 1    Are those -- does the County dispute that Mr. Begley sought and
 2    received legal advice from it during the underlying events?
 3              MR. ROVERSI:  Well, as the Hawaii Supreme Court noted
 4    in the Klattenhoff case, every County employee is a client or
 5    potential client of the County attorney, or in that case the
 6    Attorney General.  So, no, we -- I have no specific information
 7    other than Mr. Begley's declaration that he actually did so and
 8    that those conversations took place.  You know, I -- I have no
 9    information to directly contradict his --
10              THE COURT:  Okay.
11              MR. ROVERSI:  -- allegation that he sought --
12              THE COURT:  So you can't deny that.  So does -- do you
13    dispute that the existence then of an attorney-client
14    relationship during that time, and "by that time" I mean when
15    this disagreement, I'll just say, was happening and Chief Perry
16    was put on leave and Mr. Begley was sort of caught in the cross
17    hairs?
18              MR. ROVERSI:  Well, as you pointed out earlier, Your
19    Honor, I would -- I would suggest that it's sort of
20    institutional attorney-client relationship as opposed to a
21    traditional private practice attorney-client relationship in
22    that, you know, at that point County Attorney Castillo and
23    Guyot offering advice to multiple police officers, including
24    Chief Perry, people in the mayor's office, the County
25    managing -- manager, et cetera.  I would admit that there was
```

1    some relationship, yes, but that it was not a traditional

2    relationship.

3            And also point out, again referring back to the

4    Ragasa, the specific fact analysis in that case that the Court

5    focused on specific deputies and their individual involvement.

6    To the extent that he may have sought advice from specific

7    attorneys, none of those attorneys are involved in this case.

8            THE COURT:  Do you --

9            MR. ROVERSI:  (Indiscernible).

10           THE COURT:  Sure.  Do you know whether, and I'll make

11   it specific, whether anyone from the County attorney's office

12   advised Mr. Begley of the County's view of this, I'll just call

13   it a limited representation, that might not be the best

14   description, but the sort of view you just described, that this

15   was not a typical attorney-client relationship, but it was

16   advice being provided to a County employee and nothing more, do

17   you know whether he was given that warning?

18           MR. ROVERSI:  Sure.  For better, worse, I have no

19   direct knowledge of any conversations that took place with

20   Mr. Begley.

21           THE COURT:  Right.  Okay.  Fair enough.  All right.

22   You can keep going.  I just wanted to walk through that issue.

23           MR. ROVERSI:  Unless the Court has any direct

24   questions for the County, I -- I'm prepared to allow the other

25   attorneys present in the courtroom to offer their input.

1          THE COURT:  Can you -- just a few other questions
2    to --

3          MR. ROVERSI:  Sure.

4          THE COURT:  -- make sure I understand.  And I had this
5    discussion with Mr. Hosoda.  Can you describe for me the office
6    setup?  My -- well, let me know -- I'll tell you what I sort
7    of -- go ahead, answer the question before I just guess.  I
8    might have some follow-up.

9          Really what I'm interested in is physically what the
10   layout is and whether there are shared staff, paralegals,
11   assistants, that sort of thing.

12         MR. ROVERSI:  Sure.  So our office, I believe not
13   counting Mauna Kea Trask is the prime -- who's the County
14   attorney, has ten attorneys divided equally between the
15   litigation team and an advice-and-counsel team.  All -- all the
16   County attorneys, save for two, Pete Morimoto and Mahealani --
17   I'm drawing a blank on Mahea's last name, apologize -- are
18   housed in the Suite 220 at the County office building.
19   Mr. Morimoto has a separate office at the Kauai Police
20   Department.  Mahea, who is in the advice-and-counsel team, is
21   housed at the department of (indiscernible).  All County
22   attorneys have their own individual offices within our office
23   suite.

24         As far as staff goes, the office has two primary
25   paralegals that handle filing of documents.  They do not do

1    drafting of documents.  Their primary job is the filing of

2    documents and proofreading.

3         And those staff members are themselves divide -- each

4    assigned to a specific group of attorneys.  Let's see, Donna

5    Lee Brinkenhoff, one of the paralegals, is assigned to myself

6    and I believe Sinclair Ferguson.  Allison Hironaka, the other

7    paralegal, is assigned to Matt Bracken and Mark Bradbury, I

8    believe.  And to be honest, I'm -- I'm -- because Mr. Morimoto

9    is housed in a separate building, I -- I believe Allison

10   Hironaka is his assigned paralegal, but I'm not positive about

11   that.

12        Aside from the two paralegals, there are two

13   additional administrative assistants who answer phones, handle

14   the intake of mail, but generally don't have involvement in

15   filing of documents or the handling of pleadings.

16        THE COURT:  Are the --

17        MR. ROVERSI:  -- receiving -- receiving documents that

18   come in in hard copy and being sure they go in the right box.

19        THE COURT:  Okay.  So that was my next question.  Are

20   the files maintained in paper format or electronic format or

21   both?

22        MR. ROVERSI:  Our office beginning perhaps a year ago

23   has been making a transition to a electronic format.  So

24   (indiscernible) there is currently -- there's some overlap

25   between the electronic retention of documents and paper

1    documents.  And each attorney also has their own preferences.

2    Some of us request hard copies because simply it's our

3    preference to work off of hard copies, others are content to

4    work off of only electronic copies.  The answer is our office

5    is in a transition between --

6              THE COURT:  Mm-hmm.

7              MR. ROVERSI:  -- (indiscernible) there is some hard

8    copies, newer -- newer cases tend to be electronically

9    maintained, older cases are still with hard copies making some

10   transition to electronic storage.

11             THE COURT:  So on this case, if any of the five

12   attorneys here wanted to look at something in the file, would

13   they all go to the same place, whether it's a file cabinet in

14   the traditional sense or something on the server in the more

15   modern sense?

16             MR. ROVERSI:  There are paper files in a file cabinet

17   relating to this case.  I do not believe that they are

18   currently up-to-date because the -- because of our electronic

19   filing system takeover.

20             We could access the common file on server, but we also

21   each have the ability, like a cloud based server, we all each

22   have the ability to password protect our specific work product

23   on the server from other people in the office.

24             THE COURT:  And so are the lawyer --

25             MR. ROVERSI:  The general -- the general pleadings,

1 like the complaint, pleadings, et cetera, would not be password
2 protected documents.
3        THE COURT:  So are you operating with a wall or not?
4 On this case.
5        MR. ROVERSI:  Well, my -- we're operating with a joint
6 defense agreement and signed conflict waivers among individual
7 defendants.
8        THE COURT:  Is the joint defense agreement among --
9        MR. ROVERSI:  Is my understanding.  I haven't seen all
10 of those things.
11        THE COURT:  If we can pause there.  Is the joint
12 defense agreement among all currently named defendants?
13        MR. MORIMOTO:  Your Honor, Peter --
14        MR. ROVERSI:  My understanding -- go ahead.
15        THE COURT:  Go ahead, Mr. Morimoto.
16        MR. MORIMOTO:  Your Honor, the -- with regard to the
17 defendants I represent, no, they are not party to the joint
18 defense agreement.
19        THE COURT:  Okay.  Thank you.
20        So who is party to the joint defense agreement?
21        MR. ROVERSI:  Mr. -- Mr. Bracken and Mr. Ferguson
22 might correct me, but it's my understanding that the joint
23 defense agreement was entered into among the original
24 individual named -- individually named defendants, Perry,
25 Contrades and Asher

1          THE COURT:  Okay.  So then as among the parties to the

2    joint defense agreement and their attorneys on the one hand and

3    then the other 14 defendants and their counsel, Mr. Morimoto,

4    on the other, how are you operating?  With a wall or without?

5    Anybody can answer.

6          MR. MORIMOTO:  Your Honor, with regard to -- I don't

7    have access to Mr. Roversi, Mr. Bracken, Mr. Bradbury or

8    Mr. Salas-Ferguson's files.  I have access to the pleadings,

9    the discovery and that kind of thing, but as far as their notes

10   or any of that, you know, anything regarding the impressions

11   that they have of their clients, I don't have access to any of

12   that.

13         THE COURT:  So if Mr. Sinclair Ferguson has his

14   attorney working file where he's jotting down his thoughts, his

15   confidential information, his privileged information, is there

16   any way -- and if he takes appropriate steps, is there -- he

17   can keep that from you?

18         MR. MORIMOTO:  I suppose I could sneak into his

19   office --

20         THE COURT:  Right.  Aside from anything unethical.

21         MR. MORIMOTO:  Yes, Your Honor.  No, I do not.

22         THE COURT:  He can keep that -- and is it the same for

23   you, are you maintaining your thoughts, your notes, your work

24   product, your confidential information in such a way so no one

25   else from the County attorney's office can see it?

1          MR. MORIMOTO:  Yes, Your Honor.

2          THE COURT:  Would -- would one of these paralegals or

3    legal assistants have access to this information?

4          MR. MORIMOTO:  Being that it's not in the cloud and

5    not being scanned into our computer system, no, they wouldn't.

6          THE COURT:  Okay.  Okay, anything further,

7    Mr. Roversi, from you?

8          MR. ROVERSI:  Not unless -- I would -- I would -- I

9    think this is sort of beside the point, but there was mention

10   made in the Court's minute order and in Mr. Hosoda's documents

11   regarding my e-mail response that appeared to be on behalf of

12   all parties as if I were making decisions for the County

13   (indiscernible) and I would offer that my e-mail to Mr. Hosoda

14   was after I had already -- so, when I -- when I received notice

15   of the hearing date for this hearing, it was on Monday morning

16   when I came back to the office.  I contacted Mr. Hosoda --

17   well, first I spoke with the other attorneys that are present

18   for the County to see if they would be amenable to changing the

19   hearing date before I contacted Mr. Hosoda.  During those

20   conversations they indicated to me they had no problem with

21   changing the hearing date, but did not want to have that impact

22   the upcoming dispositive motions before Judge Kobayashi.

23          So when I related to Mr. Hosoda that I could not agree

24   to change the hearing dates on the dispositive motions, I was

25   not meaning to infer that I was personally making that decision

1    for everyone.  I was simply relating I could not agree to that

2    having spoken with other counsel involved in the case.  I

3    didn't have the power to make that decision.

4         THE COURT:  Okay.

5         MR. ROVERSI:  And -- and to be -- to be blunt, I was a

6    bit taken aback that I was asking for a simple courtesy to

7    accommodate a vacation and I felt that changing other portions

8    of the schedule irrelevant to the courtesy I was asking for.

9    So I did not -- if it appeared that I was speaking for other

10   parties or other attorneys, that was not my intention in my

11   e-mail.  I was dashing that off before I got on a plane for the

12   municipal attorneys' conference.

13        THE COURT:  Okay.  And I appreciate that

14   clarification.  That's why I made that note and I hope it --

15   and I understand the circumstances.  Unfortunately this case

16   has gotten aggressive between the lawyers.  I hope we can turn

17   that around, but sometimes you can't and, you know, I see the

18   communications and I've been a party to those sorts of

19   communications in private practice.  And sometimes it just

20   happens when everyone's trying to do their job for their

21   clients.

22        But, you know, the appearances are important.  And so,

23   you know, if you guys -- if the County attorneys are taking

24   these positions that you're actually only acting for your

25   client, then you need to act that way.  All the time.  Even if

1   you're rushing to get on a plane, you guys -- it just presents
2   a picture that although you -- when you're arguing a motion and
3   you're writing a declaration at your desk very carefully and
4   very thoughtfully, you're very attuned to whether there's a
5   wall or not, but then when you're not in that situation, this
6   morning's a perfect example, everyone just sits back and waits
7   for Mr. Roversi to lead the charge.  That's the picture you
8   paint.  So you shouldn't act that way if you're really
9   independent and you're really acting for each of your clients.
10  Whether you have 1 or 14, you better act that way at all times.
11  Because you make an impression on everybody otherwise.
12  That's -- that's the message I wanted to send.
13          MR. ROVERSI:  Thank you, Your Honor.
14          THE COURT:  Who else would like to argue?
15          MR. BRACKEN:  Your Honor, just along the same lines,
16  because an e-mail is attached in which I refer to all
17  defendants as well.  Before the e-mail was sent, again, I
18  checked with all counsel and so in -- to avoid sending five
19  e-mails, I just -- I talked to the other counsel and then I
20  responded to his e-mail.  So there are two e-mails attached
21  where I said "the defendants" and, again, I talked to all
22  counsel before I sent that e-mail.
23          A couple of things I just want to address because I
24  did purchase the computer system.  The software that the County
25  is currently using.

1          There are ethical walls in place in this case.  We do
2    have paper files and we do have electronic files because we're
3    in transition.  Paper files just contain pleadings and
4    correspondence.  There is no confidential information in them
5    whatsoever.  The computer system is essentially the same thing,
6    you have pleadings and correspondence.  Each person has their
7    own independent files.  We work off of a server, but we all
8    have our own.  So any confidential information essentially can
9    be kept in your own folder and no one else can see it.
10         THE COURT:  Okay.  It can be kept that way.  Is it
11   kept that way?
12         MR. BRACKEN:  It is kept that way.
13         THE COURT:  I'll just ask you, are you doing that?
14         MR. BRACKEN:  Yes, I am.
15         THE COURT:  Okay.
16         MR. BRACKEN:  So there is no confidential information
17   within the electronic file for this matter.  And even within
18   that electronic file there are still ethical walls built in
19   place that -- so not even everybody has access to that file.
20   So people can't even see pleadings essentially.  So there are
21   ethical walls in place in the software.
22         THE COURT:  Okay.
23         MR. BRACKEN:  And so there -- there are no
24   confidential information within the software.  In the software
25   file or the paper file.

1          Yeah, I mean we do operate independently, so you

2     either -- all my files are either kept in my office on my

3     computer or personal files.  So just to clarify that.

4          Your Honor, I do want to address the standing

5     argument.  Plaintiff is essentially trying to throw us all in a

6     hat and jiggle it.  I represent one person.  And so him saying

7     that he has standing to disqualify me and then he points to

8     specifically four things, he says there's a direct injury, but

9     none of that direct injury comes from my client or from me.  So

10    he does not have standing to bring this claim against me.

11         Another thing to point out, Your Honor, is the Ragasa

12    case is very different from this case.  It's a fact-specific

13    case.  I was in the case.  I filed a motion to withdraw and

14    this Court granted that motion to withdraw based on a conflict

15    of interest.

16         THE COURT:  Yup.

17         MR. BRACKEN:  It is very fact specific.  So citing to

18    the Ragasa case, it's really all about the facts, Your Honor.

19    There's no conflict of interest.  All these people that -- that

20    plaintiff may have gone and talked to who worked at the County

21    attorney's office are no longer at the County attorney's

22    office.  I didn't work with them.  I've never worked with Marc

23    Guyot and worked with Al Castillo.  There was never an

24    opportunity for them to provide me with any confidential

25    information.

1          THE COURT:  Do you know if they kept a file, either of
2     them, on their conversations with Mr. Begley?
3          MR. BRACKEN:  I -- I don't know that.  I know that
4     when Mark Guyot left the office, our staff was rather irritated
5     with him because they had to clean out his office and they
6     essentially threw away everything in his office.
7          So, whatever files he left behind were thrown away and
8     shredded.  I don't know about Al Castillo.
9          THE COURT:  Okay.
10          MR. BRACKEN:  I don't know if they have -- yeah, had
11     anything.
12          But this -- at the time when they left the office
13     there was no electronic -- we don't have the -- essentially the
14     electronic system we have in place now which we can essentially
15     keep a record of everything but was not in place that time, it
16     was all paper, so...
17          And then the other thing I want to point out, Your
18     Honor, it is different for government attorneys.  We're
19     asked -- I mean we advise multiple departments, commissions.
20     We appear -- I appear in front of the Planning Commission and
21     argue in front of the Planning Commission and a Deputy County
22     Attorney sits on the Planning Commission and advises the
23     Planning Commission.
24          It's different for government attorneys.  It's -- the
25     imputation laws -- the imputation -- the ethical rules are

1    different for attorneys, for government attorneys.  And that's

2    what Klattenhoff talks about.  And it's -- it's in the rules,

3    Your Honor.  Rule 1.11 is specific for government attorneys.

4    And Comment 2 specifically says because of the special problems

5    raised by imputations within a government agency, Paragraph D

6    does not impute the conflicts of a lawyer currently serving as

7    an officer or employee of the government to other associated

8    government officers or employees.  These imputations, they

9    don't -- they don't attach to government attorneys, Your Honor.

10            And plaintiff saying that, okay, Mauna Kea Trask is

11   the County Attorney, he was around during this time, it doesn't

12   point to actually any information or confidential information

13   he has.  And the County Attorney Mauna Kea Trask is not a part

14   of this case.  We don't need a declaration from him saying that

15   he doesn't have confidential information.  He's not a party.

16            THE COURT:  Is he working on this case at all,

17   Mr. Trask?

18            MR. BRACKEN:  Not at all.

19            THE COURT:  Does -- to your knowledge does anyone on

20   this case report to him?

21            MR. BRACKEN:  About this case?

22            THE COURT:  Yeah.

23            MR. BRACKEN:  So we all --

24            THE COURT:  I mean he's essentially each of yours

25   boss, right?

1          MR. BRACKEN:  Correct.

2          THE COURT:  Okay.  So how do you maintain that's --

3    and when I ask the law question, I'm not looking for a

4    particular answer, I'm just curious whether you have one or

5    not.  And if you have one it suggests you feel the need to have

6    one and then I'm curious, do you follow it all the way up, do

7    you follow it all the way down.

8          MR. BRACKEN:  It goes all the way up, Your Honor.  My

9    understanding is the Shibuya case existed, and that was a case

10   where the plaintiff's a party, that case has existed while I

11   was at the County attorney's office and I have never been a

12   part of a meeting where that case was discussed.  I -- I

13   specifically remember leaving meetings because they were going

14   to discuss the Shibuya case.  So it's been in effect, the

15   ethical wall has always been in effect, the ethical -- I mean

16   this is all really important to our office.

17         So I was -- you know, Mauna Kea Trask is our -- our --

18   my supervisor.  I don't know how -- I mean I don't report to

19   him what's happening in the case.  I have an ethical obligation

20   to my client and that is to represent him in this litigation

21   case and -- and his wishes.  And so I mean I have a pending

22   Motion to Dismiss in this case.  That's what he wants.  He

23   wants out of this case.  So Mauna Kea Trask does not direct how

24   any of the attorneys handle this case.

25         THE COURT:  Okay.

1          MR. BRACKEN:  And beyond that I really have nothing
2     else unless you have any questions for me.

3          THE COURT:  Not at this time.  Thank you.

4          MR. BRACKEN:  Thank you.

5          MR. MORIMOTO:  Good morning, Your Honor.  Peter
6     Morimoto.

7          THE COURT:  Good morning, sir.

8          MR. MORIMOTO:  I have a little diagram here of our
9     office, if that would help you.  I don't know if --

10          THE COURT:  I think I have a good understanding.
11     Thank you very much, though.

12          MR. MORIMOTO:  Your Honor, with regard to my clients,
13     I think this motion is a little premature given the fact that
14     there is Motions to Dismiss pending and if the judge rules as I
15     believe she will rule, it will become moot.  There will be
16     no -- I won't be involved in the case, I'll be out of it
17     completely, as will my clients.  And so any conflict that I may
18     have, and I don't believe I have one now, would disappear.
19     And --

20          THE COURT:  What if she doesn't grant the motions?

21          MR. MORIMOTO:  Well, at that stage, I think, Your
22     Honor, we would have to revisit the issue.

23          THE COURT:  Are your clients aware of that?

24          MR. MORIMOTO:  Yes.

25          THE COURT:  All 14 of them?

1          MR. MORIMOTO:  Yes.

2          THE COURT:  Because my concern, you know, I've --
3     I've -- and I read your brief and I understand your position
4     and I can certainly appreciate kicking the can down the road as
5     far as cross-claims or third-party complaints, that is not
6     atypical.

7          But I've never seen someone represent 14 clients at
8     once.  Have you?

9          MR. MORIMOTO:  It's the first for me, Your Honor.

10         THE COURT:  Right.  And that's why even at the outset
11    you don't know their names.

12         MR. MORIMOTO:  Well...

13         THE COURT:  If you were here for one of them, you
14    would have had no problem.  If you were here for three of them
15    you would have had no problem.  You had to find your notes to
16    read off your 14 clients' names.  I don't know that it's
17    unethical.  I also don't know that it's a great idea.

18         MR. MORIMOTO:  Well, Your Honor, we do what we must in
19    these circumstances.  We are a small office and I am normally
20    assigned to advice and counsel.  I was, for lack of a better
21    word, pulled in this case because we were running out of
22    bodies.  And --

23         THE COURT:  Which is not a great reason.

24         MR. MORIMOTO:  I understand that, Your Honor, but
25    given -- given the facts of this case and -- and I think if

1  you -- I can't recall if you attached the -- well, let me --
2  let me step back.
3          If you read Judge Kobayashi's minute order it's pretty
4  clear that the --
5          THE COURT:  It's pretty clear that she wants to
6  address certain preliminary issues.  That's all.
7          MR. MORIMOTO:  Correct, Your Honor.
8          THE COURT:  But you might have a real clean out and
9  you might be gone in a month.  But you might not.  And so if
10 you're not and you're then sitting down with some portion of
11 these 14 clients and talking to them and they want to take a
12 different position, vis-a-vis, other defendants, what do you
13 intend to do at that time?
14         MR. MORIMOTO:  At that time, Your Honor, I intend to
15 withdraw.  And we would have to --
16         THE COURT:  For all of them?
17         MR. MORIMOTO:  Yes, Your Honor.  We would have to
18 appoint special counsel for -- for the 14.
19         THE COURT:  Okay.  All right.  You can keep going.
20 I -- I wasn't sure I understood you there.  Nothing further?
21         Okay.  Anyone else?
22         MR. BRADBURY:  Yes, Your Honor, Mark Bradbury on
23 behalf of Michael Contrades.  I just wanted to point out
24 there's all this focus and emphasis on the Klattenhoff case.
25 Klattenhoff was a 1990 case, 27 years later, Hawaii didn't

1    adopt the HRPC, what they did is they brought in the model

2    rules and created their own rules.  That was in 2000.  Okay.

3    So in 2000 onward, which is ten years past Klattenhoff, Comment

4    2 became the law.  It superseded Klattenhoff.  And so the

5    emphasis on the amount of attorneys in the office is really

6    misplaced.  Because if you look at the State of Hawaii,

7    90 percent of the firms have less than 11 members.  So, that

8    would -- that would only allow 10 percent of the firms to -- to

9    engage in a situation where they would need a screening or

10   Chinese wall.  And that's just -- that's just not the way it

11   is.  Because when the State adopted the screening and Chinese

12   wall for private firms --

13          THE COURT:  Let's go with ethical wall.  How about

14   that?

15          MR. BRADBURY:  Ethical wall.

16          THE COURT:  Thanks.

17          MR. BRADBURY:  Yes.  When they recently adopted the --

18   the ethical wall to address private firms, it was well after

19   Klattenhoff.

20          THE COURT:  Right.  Right.  And I understand that, you

21   know, government and law firms like yours are different and I'm

22   trying to get my arms around that.  And that just how far we

23   extend this concept in a way that preserves the ability of

24   government, legal organizations to do their jobs, which are

25   complicated jobs and can be much more complicated than a

1    private attorney's job where Mr. Hosoda's got one client, very

2    clear and he's marching to those orders, and you're trying to

3    manage something more complex.  And so I want to be sensitive

4    to that, but I also want to be sure your clients are getting

5    everything they need, including whether they're even clients.

6    And if you're taking the position in some instances that

7    they're not clients, are you telling them that.

8              MR. BRADBURY:  Well --

9              THE COURT:  That -- that's my concern.  That -- that's

10   what we're wrestling with here.

11             MR. BRADBURY:  I only have one client.

12             THE COURT:  Right.

13             MR. BRADBURY:  And I'm looking out for his interests.

14   I don't bother myself with these other clients.  And I didn't

15   even know the names of Mr. Morimoto's clients.

16             THE COURT:  Well, he doesn't know the names.

17             MR. BRADBURY:  Well, you know, he's like me, we're

18   getting a little older.  I don't -- I don't think if I was in

19   his position I would have been able to remember all 14 myself.

20             In any event --

21             THE COURT:  But you would have been able -- you could

22   have remembered one.

23             MR. BRADBURY:  Right.

24             THE COURT:  And you did fine with that this morning.

25             MR. BRADBURY:  And sometimes --

1          THE COURT:  Right.  And that's important.

2          MR. BRADBURY:  No, I understand that.

3          THE COURT:  That simple thing is important.  Okay.

4          MR. BRADBURY:  Nothing further.

5          THE COURT:  All right.

6          MR. SALAS-FERGUSON:  Your Honor, Sinclair

7    Salas-Ferguson for the record.

8          THE COURT:  Morning.

9          MR. SALAS-FERGUSON:  Good morning.  I represent Darryl

10   Perry in his individual capacity for the aiding and abetting

11   cause of action and the intentional infliction of emotional

12   distress.

13          Regarding the Court's concern about the appearance of

14   certain attorneys, I guess, making decisions for everybody,

15   regarding the e-mails and I guess communications with opposing

16   counsel, I only respond when it's something necessary regarding

17   my client and the causes of actions against him.  The discovery

18   requests that are sent over specifically to my client, I deal

19   with them.  So I sit back and deal with issues that involve my

20   client.  Today it involves a Motion to Disqualify me from

21   representing him.  So I'm going to address specifically my role

22   in that.

23          When I was assigned, the County went to the Police

24   Commission and asked for representation for the individuals in

25   this case, whether or not the facts alleged in the complaint

1   were relating to the scope of employment of the defendants in
2   the case, I was then assigned.  I advised my client about the
3   potential conflicts.  He signed a waiver on that knowingly.  We
4   entered into a joint defense agreement between the individuals
5   and the County.  And then we began our representation.
6          Specifically regarding this motion, I've -- I met
7   Begley once at the settlement conference.  I've never met him
8   before.  I've never represented him.  During the time the
9   underlying facts of this case, I wasn't around, I came on after
10  when the -- when the complaint was filed.  So I don't believe
11  that there is anything -- I don't believe there's standing for
12  them to ask for me to be recused from representing Chief Perry.
13  And I also don't think that even if there was standing, there's
14  no even scintilla of me violating 1.7 or 1.9 of the Hawaii
15  Rules of Professional Conduct.  And for those reasons I ask
16  that regarding my representation of Chief Perry that the motion
17  be denied.
18          THE COURT:  So among the -- the -- I think it's the
19  four defendants that have this joint defense agreement, the
20  three individuals and the County, I gather then the
21  agreement -- no one -- the County's not taking the position
22  that your client, Chief Perry, acted outside the course and
23  scope of his employment?
24          MR. SALAS-FERGUSON:  No.
25          THE COURT:  Okay.

1          MR. SALAS-FERGUSON:  And that's -- that's already been

2    decided even before we were -- the Police Commission already

3    made that decision.

4          THE COURT:  Okay.  Okay.  Thank you.

5          MR. SALAS-FERGUSON:  Nothing further, Your Honor.

6          THE COURT:  Thank you.  Go ahead, Mr. Hosoda.

7          MR. HOSODA:  Thank you, Your Honor.  I'll take them in

8    reverse order.

9          THE COURT:  Mm-hmm.

10          MR. HOSODA:  So first of all, with Sinclair's

11    comments, I don't have too much to add, but I would take Your

12    Honor back to context once again.  And the guy -- Mr. Guyot's

13    deposition as well as Mr. Castillo's deposition are very

14    important reads from the outset because when I tried to get

15    them scheduled, first of all, I was dealing with all these

16    different schedules.  But I walked into the first deposition

17    and before I asked a single question about anything of

18    substance, Mr. Roversi jumped in and cautioned and admonished

19    Mr. Castillo saying, You're not to divulge any confidential

20    information, which then spun into Mr. Castillo basically

21    saying, I don't know what to do here.  I want counsel.

22          And they appointed Mr. Morimoto as his counsel for the

23    entire rest of the deposition.  And Mr. Castillo's entire

24    demeanor and his -- the way he testified completely changed.

25    He was instructed not to answer questions based upon

1    attorney-client privilege, which I am not conceding to because

2    I think that's a fight for another day, but it wasn't

3    Mr. Morimoto who was doing the objecting.  He didn't even put

4    on a microphone for the video.  He said, I don't want to

5    because I'm not going to do any objections or instructions.

6    Mr. Roversi did all of the objections and instructions not to

7    answer.

8         THE COURT:  Saying in his position -- Mr. Roversi's

9    position was that it was because the County held the privilege

10   as the client?

11        MR. HOSODA:  Right.  In many circumstances, but two

12   additional ones are critical because I started to ask about a

13   communication that Ms. Abbatiello had with Mr. Castillo and the

14   County, and the rest took the position that she was a client

15   seeking legal advice from Mr. Castillo and that that was

16   attorney-client privilege.  So she was -- he was not allowed to

17   answer questions about that.

18        Same questions for the mayor and Mr. Heu, who was his

19   managing director, I asked, you know, about communications and

20   advice given by Mr. Castillo to the mayor and to Mr. Heu, and

21   they instructed him not to answer based upon the mayor being a

22   client.

23        Now, I think it's really important to read those

24   depositions because Mr. Morimoto says in his declaration that

25   there was no adverse testimony given by Mr. Castillo --

1          THE COURT:  Right.

2          MR. HOSODA:  -- and Mr. Guyot against the County.

3     Your Honor, I disagree.  If you read those depositions, what I

4     think you'll come away with is, they saw the retaliation, they

5     advised against the retaliation in writing at least, if not

6     verbally, and they determined that it was retaliation, you

7     know.  The EEOC, which gets thousands of complaints on

8     retaliation, the percentage finding cause I think is less than

9     2 percent.  And two out of the three claims made by Mr. Begley

10    in this case were found with cause.

11         But I think that when we talk about conflict and the

12    influencing and the information, what you have to look at is

13    this complete change in position because you had the County

14    attorney and the deputy that's in charge of working on this

15    saying, This is retaliation, you have to stop this, you're

16    going to subject yourself and the County to liability.  They're

17    writing all this stuff based upon each and every one of those

18    acts that we're alleging.

19         Now Mr. Morimoto represents him.  And now he

20    represents 14 other defendants.  That goes to Mr. Roversi's

21    first point of, Hey, Ragasa was fact specific and you have to

22    do that analysis.  I concur.  We are asking that all be removed

23    because of this change of position and the context where

24    everybody is involved and the access to information.  But we do

25    do the analysis, the fact-specific analysis for each and every

1   conflict, including specifically, for example, Mr. Morimoto

2   having 14 clients and also receiving all of that information

3   that Mr. Castillo is giving him while he's being deposed, Hey,

4   how do I answer this question?

5         Your Honor, sometimes cases turn on one question.  One

6   critical question.

7         THE COURT:  Yup.

8         MR. HOSODA:  Here, I mean there's a lot of different

9   questions that are being -- a lot of different information

10  that's being shared.  And so I don't see how it is that you can

11  represent all of those interests.  I'm thinking, what happens

12  when we get to trial and Mr. Morimoto's representing his 14

13  clients, what am I going to do with Mr. Castillo?  Do I put him

14  on the stand or do I cross-examine him?  Because I have

15  information given by Mr. Castillo to me or do I use that

16  information for the benefit of my 14 clients?  Or do I look out

17  for Mr. Castillo's best interest?

18        You can't cut off your -- your representation.  And if

19  you're going to cut it off, and I think this is the key, we as

20  lawyers have the obligation when we're going to represent

21  somebody to ensure that they know the scope of our

22  representation.  The way we do that is we tell them and then we

23  put it into writing and we have them sign it.  Right.  That was

24  not done here by Mr. Begley's declaration.  So you can see

25  where the layperson is thinking, I have an attorney

 1    representing me, he's representing my best interest, especially

 2    when Mr. Castillo and Mr. Guyot are giving personal advice and

 3    counsel to go to the EEOC, file a complaint.  These are things

 4    that make it such that -- and when there's a change in position

 5    from one County attorney to the next, but then you have the

 6    consistency of Mr. Trask being involved as a deputy at the same

 7    time, the information was all there.

 8          Stepping back to Mr. Bradbury, Your Honor.  What

 9    happened here is when Mr. Guyot and Mr. Castillo were writing

10    to Chief Perry saying, You have to stop this, this is

11    retaliation, you're going to get us all in trouble, the chief

12    didn't like that.  So, as he didn't like many of the things

13    that people telling him stop doing that.  So he filed Office of

14    Disciplinary Counsel complaints against Mr. Castillo and

15    Mr. Guyot.  Mr. Bradbury was the attorney at the ODC at the

16    time who was charged with the responsibility of investigating

17    those complaints.  We have that file.  It's not a one-page

18    here's my complaint.  There are a number of exhibits attached

19    to it laying out facts giving information to him at that time.

20    So how there's not conflict or there's not information being

21    exchanged is critical.

22          And then what happens next is, after Mr. Bradbury

23    determines that there's no cause to these -- to ODC complaints,

24    he then doesn't like that, so he files and makes a report to

25    Justice Recktenwald about Mr. Bradbury's behavior.

1          THE COURT:  Chief Perry complained to Recktenwald?

2          MR. HOSODA:  Yes.

3          THE COURT:  CJ Recktenwald.

4          MR. HOSODA:  Mr. Morimoto and I don't see eye-to-eye

5     on this Motion to Dismiss.  I -- I -- rereading Judge

6     Kobayashi's order asking us to focus our attention on five

7     specific areas, I don't think that that says he's going to win.

8     And I think that the better way for judicial efficiency and

9     economy were that we have a ruling on this motion to determine

10    whether there are -- there is infected counsel or not.  And

11    conflict -- I'm sorry, conflicted counsel.  Because I think

12    that if you allow the Motions to Dismiss to proceed like we've

13    pointed out, I think that that's a bigger problem than if we go

14    the other way around.

15         And Your Honor issued an EO as well, I think it's 160,

16    in which you suggest that we should consider -- you ask that

17    the defense consider my suggestion that we talk about a

18    briefing schedule for the Motion to Dismiss and a hearing date.

19    We tried, but it's -- the two -- Mr. Morimoto's position is

20    we're going to win the Motion to Dismiss, so we should proceed

21    that way.  Mine was, I don't think we should proceed because I

22    think that if there's a ruling, especially an adverse ruling to

23    them, then this whole conflict issue is going to complicate

24    things dramatically.

25         So Your Honor had indicated that you're not inclined

1   to rule from the bench today.  And I --

2            THE COURT:  I think everyone's entitled to my -- my

3   thoughts in writing.

4            MR. HOSODA:  Right.

5            THE COURT:  Because someone is likely to be unhappy.

6            MR. HOSODA:  Right.  But on that, again, our

7   oppositions are due tonight.  They're ready to go.  But I think

8   that, again, it doesn't make sense to have those motions heard

9   before Your Honor rules on -- because it could dramatically

10  change.  They could either all be conflicted or maybe

11  Mr. Morimoto could be conflicted, but either way, I think that

12  it's better that we wait on that.

13           THE COURT:  And just on that point, I'm not touching

14  the briefing schedule for the things in front of Judge

15  Kobayashi.

16           MR. HOSODA:  Understood.

17           THE COURT:  So you guys march forward to what you're

18  doing and we'll do our best to get an order out as quickly as

19  we can.  And I also understand at this point I don't think you

20  folks can agree on what day of the week it is.  And so everyone

21  just do their jobs and we'll do our job.

22           MR. HOSODA:  Thank you, Your Honor.

23           The County Charter for Kauai provides for special

24  counsel for exactly these types of situations.  So I know he

25  was being a little loose with his words, but running out of

1    bodies, that's -- the County Charter clearly provides for that.

2          You know, I've been told many times in this case that

3    as government lawyers we can do this.  We're different.  After

4    reading some of the cases I understand that there are certain

5    distinctions and in reading the rules cited by Mr. Bracken I

6    agree.  But there are certain things that our professional code

7    of responsibilities do not change on and those are to ensure

8    that the client understands whether or not they are a client

9    and what their -- the scope of their representation is.

10          THE COURT:  Right.

11          MR. HOSODA:  And it is clearly on the attorney and not

12    the client to make sure that they're aware of that.

13          THE COURT:  I think so.  The duty of loyalty runs from

14    the attorney to the client, not -- and it doesn't run back,

15    it's not a two-way street.

16          MR. HOSODA:  And again, I point out that when you read

17    these depositions, you will see that they take the position

18    that those individuals are their clients.

19          THE COURT:  Right.

20          MR. HOSODA:  And I am sure that whether it's Officer

21    Begley or any one of the 14 clients that Mr. Morimoto

22    represents have not and do not understand the difference

23    between the institutional representation versus the individual

24    representation.

25          Very interesting to note, when you read Mr. Guyot's

1    deposition, only one attorney went.  This was in Texas.

2              THE COURT:  Mm-hmm.

3              MR. HOSODA:  And I understand the expense and we did

4    have a going back and forth on where it was going to be taken.

5    But how can you zealously represent when a key witness, you

6    know, a lead key witness is -- only one person attends and then

7    how is the information shared?  You can't get the same thing

8    from a transcript as you are in person.

9              There was a representation that Mr. Trask is not

10   working on this case.  While I agree with you, Your Honor --

11   with that representation that he does not represent a client in

12   this case, I will tell Your Honor that Mr. Trask has contacted

13   me on a number of occasions, the first one was to try and

14   settle the case.  So, in order to settle the case I think you

15   have to know something about the case.  You have to understand

16   all the facts, what the potential exposure is.  And so he

17   negotiated not directly with me but he asked for permission to

18   speak with my client directly.  But in order to do that he had

19   to have knowledge of the facts.  So to say that he's not

20   representing a client here, he stood (indiscernible) for the

21   County.

22             THE COURT:  Right.

23             MR. HOSODA:  To say that he doesn't have any

24   information, that's not accurate.

25             THE COURT:  Sure.  And you had some discussions with

1    Mr. Trask about I think scheduling of the motions.  I think
2    when you filed the amended complaint, when I granted that leave
3    I thought I saw mention that Mr. Trask asked for some time to
4    explore the representation issue.

5           MR. HOSODA:  Yeah, he did.  He called me and he asked
6    me for courtesy to wait, not -- not to serve the first amended
7    complaint.  And actually I had to call him back after about 8
8    or 9 weeks and say, Is it time yet?  And he finally said yes.

9           But, again, in order to ask me, he had to know that a
10   first amended complaint had been granted.  He had to know
11   basically that there were additional -- many additional
12   defendants being named.  And he had to go to County counsel and
13   ask for, How are we going to handle this?  And in order to get
14   that, the information on whether or not they acted within the
15   course and scope of their employment, I think you have to do an
16   analysis of that.  And then to determine who's going to --
17   assign to represent, I think you need -- I think you need
18   facts.

19          You know, we talked a lot about electronic files and
20   as I'm hearing it today that there's no access to confidential
21   information through electronic files.  Again, when this was
22   going on in 2012, somebody had to be taking notes, there had to
23   be e-mails, there had to be all -- we -- we did litigation hold
24   letters right at the outset.  It was represented to me that
25   they have preserved all e-mails.

1          Well, we have document requests that have been out
2     since the beginning of this case and we don't have a lot of the
3     information that if they were being -- if there was electronics
4     going on, we don't have that.  So I guess that's a discovery
5     dispute.
6          And finally, Your Honor, I had said that the
7     government attorneys have told me many times that because
8     they're government attorneys, they can do this.  They're still
9     subject to the conflict of interest rules, especially under
10    Rules 1.7 and 1.9.  But that doesn't change just because
11    they're government attorneys.
12         So unless the Court has any further questions, I have
13    nothing further.
14         THE COURT:  Okay.  I don't.  I had one follow-up
15    question, it might be most appropriate for Mr. Roversi.
16         Mr. Roversi, just be sure -- you still there?
17         MR. ROVERSI:  Yes, I am.
18         THE COURT:  Okay.  Great.  Thank you.
19         So Mr. Hosoda in his briefs and certainly in his
20    rebuttal argument mentioned the objections I think you
21    articulated during the Castillo and Guyot depositions.  And he
22    says that the County took the position that the mayor and
23    Mr. Heu, was he the managing director?  And Ms. Abbatiello were
24    clients such that I guess you were in a position to assert the
25    attorney-client privilege.  Is that -- do you disagree with

1    that?

2         MR. ROVERSI:  The County's position was that those

3    individuals working in their official capacities are

4    essentially the County.  And we, as to Mr. Castillo, simply

5    informed Mr. Castillo that it was the County and not him as the

6    attorney who held the privilege and as stated as a matter of

7    principle, but the County does not waive the attorney-client

8    privilege for any legal advice that he offered to the County or

9    individuals in their official capacity.

10         I don't recall -- I'm -- I'm out working from home, I

11   don't have the entire Guyot deposition.

12         THE COURT:  And I do and I'm going to look at it.  I

13   just thought while I had you here, I would get your response.

14         MR. ROVERSI:  Yeah.

15         THE COURT:  I'll read it.

16         MR. ROVERSI:  My -- my objections in the Guyot

17   deposition to my memory were almost exclusively limited to

18   objections that plaintiff's questioning was asking him to

19   (indiscernible) legal conclusions.  I don't recall ever

20   instructing Mr. Guyot not to answer questions and I expressly

21   in both depositions made it known to them that I was not

22   representing either of them as their attorney.

23         And since we're talking about depositions, Mr. Hosoda

24   misspoke when he said I was the only attorney participating in

25   the Guyot depositions.  I was the only person physically there

1 due to the cost of travel, but all the other attorneys were
2 participating by phone.

3          THE COURT:  Okay.

4          MR. ROVERSI:  And I believe did make objections during
5 the course of the deposition.  Although I was primary -- the
6 primary body doing so on behalf of the County since I was
7 sitting there.

8          THE COURT:  Okay.  Thank you.  I appreciate --
9 Mr. Hosoda, go ahead.

10          MR. HOSODA:  I didn't mean to mislead the Court --

11          THE COURT:  I know.

12          MR. HOSODA:  -- on that.  I think I alluded to just
13 physical presence.

14          THE COURT:  And that's how I took it.  I understand
15 that.

16          MR. HOSODA:  And -- and just lastly, when you read the
17 depositions I think you will see that Mr. Roversi actually
18 instructed these -- Mr. Castillo not to answer the questions,
19 the ones posed with respect to the mayor and Ms. Abbatiello.

20          THE COURT:  Okay.  Thank you.  As I was saying, I do
21 appreciate the briefing on this and the thoughtful argument.
22 We're going to take this under submission and try to get an
23 equally thoughtful order out to all of you.

24          And I'll just add, you know, as -- as we've drilled
25 down into the details on this, as I've done, and I know you

1    have and hopefully this morning was thought provoking for

2    everybody, if anyone reassesses their position, you know, let

3    us know.  I do think these ethical rules are important and if,

4    you know, you don't necessarily -- you shouldn't wait for a

5    court order if you decide you need to be doing something

6    differently.

7         But that's just to say, I'm drilling down in it.  I'm

8    not entirely sure where I'm coming out on these things and to

9    the extent any of you are thinking about things, you need to

10   act on them.  You shouldn't wait for -- for a court to.  But

11   with that said, we'll -- we'll get something out as quickly as

12   we can.  Thanks everybody.

13        MR. HOSODA:  Thank you, Your Honor.

14   (The proceedings concluded at 10:41 a.m., September 1, 2017.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIBER'S CERTIFICATE

 2

 3          I, CYNTHIA FAZIO, Court-Authorized Transcriber, United

 4    States District Court, District of Hawaii, Honolulu, Hawaii, do

 5    hereby certify that pursuant to 28 U.S.C. §753 the foregoing is

 6    a true, complete and correct transcript from the electronic

 7    sound recording of the proceedings had in connection with the

 8    above-entitled matter and that the transcript page format is in

 9    conformance with the regulations of the Judicial Conference of

10    the United States.

11
            DATED at Honolulu, Hawaii, April 13, 2018.
12

13

14                        /s/ Cynthia Fazio
                          CYNTHIA FAZIO, RMR, CRR, CRC
15

16

17

18

19

20

21

22

23

24

25
```